**STATE of Missouri, Respondent,**

v.

**Henry DANIELS, Appellant.**

**No. WD 63642.**

Missouri Court of Appeals,
Western District.

Oct. 25, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 20, 2005.

---

Kent E. Gipson, Kansas City, MO, for Appellant.

Deborah Daniels, Jefferson City, MO, for Respondent.

Before EDWIN H. SMITH, C.J.,
ROBERT G. ULRICH and PATRICIA
BRECKENRIDGE JJ.

ROBERT G. ULRICH, Judge.

Henry Daniels appeals his conviction following jury trial for the class A felony of murder in the second·degree. Mr. Daniels was sentenced as a persistent offender to twenty-five years imprisonment for the death of Linda Smith. In this direct appeal, Mr. Daniels contends (1) that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to prove beyond a reasonable doubt that a murder had occurred or that the defendant had committed it. Mr. Daniels further contends that the trial court erred in (2) overruling his motion to suppress his statements to investigating detectives; (3) overruling his pre-trial motions to preclude evidence of luminol testing; (4) overruling his objection to hearsay statements; and (5) precluding evidence of alternative perpetrators.

The judgment of conviction is reversed, and the case is remanded for a new trial with directions.

### Facts

Linda Smith was first reported missing on Wednesday, June 11, 1997. That same day, Ms. Smith's car was found abandoned near the Missouri River at 205 Holmes, Kansas City, Missouri. Her purse was found inside the vehicle without money· or credit cards. Her dismembered torso was discovered in the Missouri River on June 19, 1997, approximately 150 feet to the east of the Chouteau Bridge. Her head, arms, and legs had been severed, though the cause of death was listed as "undetermined violence." Investigation ensued, and Mr. Daniels was ultimately charged with second-degree murder in the death of Ms. Smith, tried, and convicted.

Viewed in the light most favorable to the verdict, the evidence adduced at trial revealed the following information about Ms. Smith's death. Donald Smith, Ms. Smith's ex-husband and the father of two of her three children, received a telephone call on Tuesday, June 10, from Annie Rogers, the woman who babysat Ms. Smith's three children.[1] Ms. Rogers told Mr. Smith that Mr. Daniels had left Ms. Smith's children with her that day and had not returned for them. Mr. Daniels had also brought the children to Ms. Rogers the preceding morning of Monday, June 9, and returned for them the same evening. Mr. Smith told Ms. Rogers to call again if Ms. Smith did not come for the children, and he proceeded to his place of employment where he worked nights.[2] Mr. Smith testified that Ms. Rogers called him again at approximately 8:00 a.m. Wednesday morning, June 11, after he had arrived home.[3]

After speaking to Ms. Rogers, Mr. Smith contacted Mr. Daniels by telephone. Mr. Daniels had been dating Ms. Smith for approximately four years. Ms. Smith lived in a house in Kansas City that was owned by Mr. Daniels, for which she paid no rent, and she and her children frequented Mr.

---

1. Ms. Rogers was deceased at the time of trial, but her deposition had been videotaped and was played for the jury.

2. Mr. Smith's wife had died a month before these events, and he had not worked since her death. He was not returning to work but went to his place of employment for other reasons.

3. This description of the events was the one provided by Mr. Smith. Ms. Rogers' video testimony was substantially similar, although she testified that the children had been left with her on Monday and that no one had come to pick them up until Mr. Smith arrived on Tuesday or Wednesday.

Daniels' home, another house located in Kansas City. In this initial conversation with Mr. Smith, Mr. Daniels said that he had not seen Ms. Smith since she left his home Sunday night, June 8, and that this was not the first time she had disappeared for a day or two. Mr. Smith made arrangements for Mr. Daniels to provide a key to permit his entry into Ms. Smith's home.

Mr. Smith acquired the three children from Ms. Rogers and retrieved the key to Ms. Smith's house. When he entered Ms. Smith's house, Mr. Smith observed that the residence was in a very dirty condition, and it appeared that Ms. Smith had not been there for some time. Mr. Smith retrieved clothing and medication for the children; Ms. Smith's work identification (ID) needed for her employment at UPS; and letters apparently sent to her by a man named Chris Van Perkins, stated to have then been incarcerated with the Missouri Department of Corrections.

Mr. Smith spoke several times with Mr. Daniels over the next five or six days. The first time was Wednesday morning, June 11, when Mr. Smith telephoned Mr. Daniels immediately after Ms. Rogers telephoned him to say that Ms. Smith had not yet obtained her children from Ms. Rogers. Mr. Daniels had brought the children to Ms. Rogers Tuesday morning, June 10. Throughout these conversations, Mr. Smith testified that Mr. Daniels told him differing accounts of the last time he saw Ms. Smith. In one conversation, Mr. Daniels said that he had last seen her when he entered the bedroom, leaving her in the den. Another time he said that he saw her on Monday morning, June 9, and that she had left the house while he was sick in bed. During another conversation, Mr. Daniels said that he last saw Ms. Smith inside the house when he left with the children to take them to Ms. Rogers.

Mr. Daniels volunteered to Mr. Smith throughout these conversations that he had given Ms. Smith various sums of money in the days prior to her disappearance. Mr. Smith testified that he recalled being told of amounts that totaled more than a thousand dollars. Mr. Daniels neither indicated to Mr. Smith that he had reported Ms. Smith missing nor that he intended to. Mr. Daniels did not report Ms. Smith missing. She was reported missing by her parents after discussing her disappearance with Mr. Smith.

In a conversation with Wayne Wiley, Ms. Smith's stepfather, Mr. Daniels said that the last time he saw Ms. Smith was Monday morning, June 9. Mr. Daniels said that he saw her in her car while he was in his own car with her children. He said that Ms. Smith told him she was going to work and to the beauty parlor after work. Mr. Daniels repeated this version of events again to Mr. Wiley at a later date. The owner of the beauty parlor frequented by Ms. Smith testified that his business and most beauty parlors in the city close on Mondays.

Adrian Smith, Ms. Smith's son, was ten years old when his mother disappeared and sixteen years old when he testified at trial. He testified that Ms. Smith, he, and her other children had spent the Sunday night prior to her disappearance at Mr. Daniel's home. The children and Ms. Smith had slept at Mr. Daniels' home as many as three or four times a week during the several weeks preceding Ms. Smith's disappearance. Ms. Smith and Mr. Daniels had slept in the den the night of June 9. Adrian Smith testified that Sunday evening was the last time he saw his mother and that Mr. Daniels took the children to Ms. Rogers' home the next morning. Early Monday morning when Adrian's two siblings asked Mr. Daniels where their mother was, Mr. Daniels told the children

that she had left the house.[4] Adrian observed that Ms. Smith's car was then parked in front of the house, however. Adrian also testified that his mother's vehicle had been parked in the driveway of the house the evening of June 9. The vehicle was found on June 11 in the River Market area of Kansas City. Adrian said that Mr. Daniels acquired the children from the babysitter Monday afternoon. At trial, Adrian's earlier deposition testimony was that he and the other children were taken by Mr. Daniels' to his home but were told to stay out of the den. At trial, Adrian could not recall giving this deposition testimony and stated that the children were told to wait in the car while Mr. Daniels went into his house for a moment.

Monday evening, June 9, at approximately 8:00 p.m., Mr. Daniels contacted Anna Dameron. He told Ms. Dameron that he would need her help with something. She agreed to assist him, and Mr. Daniels said that he would call back within an hour. Mr. Daniels called again at around 10:15 or 10:30, at which time he asked Ms. Dameron to meet him at the overpass near the Flamingo casino, which was near her home, and to provide him transportation.[5] Ms. Dameron stated that she was initially reluctant to assist Mr. Daniels, but she was persuaded when he assured her that he would assist her in the future. Ms. Dameron went to the location, where she waited for Mr. Daniels for 30 to 45 minutes.

When Mr. Daniels finally arrived at her car, he was wearing a brown jacket, blue shirt and pants, and tennis shoes. Mr. Daniels had dried mud on his pants and shoes, and a "real foul odor" about him. Mr. Daniels then asked Ms. Dameron to take him to his car, which was parked at a Country Mart on 31st and Prospect Streets in Kansas City, Missouri. Mr. Daniels fell asleep during the drive, which took about fifteen or twenty minutes, and he said nothing about why he was at the casino or what he had been doing. Ms. Dameron left him at his car, and upon exiting her vehicle, Mr. Daniels stated that he would remember her in his will.[6]

Wednesday, June 11, Mr. Daniels was seen in the area of Admiral Boulevard and Paseo between 1:00 and 2:30 in the afternoon. Mattie Kyles, a co-worker of Mr. Daniels, was driving in the area when she heard someone call her name. She stopped her car, and Mr. Daniels approached the vehicle. He asked her if she would give him a ride to the Flamingo Casino, which she did. Ms. Kyles teased Mr. Daniels about gambling in the middle of the workday, and Mr. Daniels responded that his car had broken down at the casino when he and Ms. Smith had been there "the other night." Ms. Kyles did not know which night or car he was referring to. Ms. Kyles drove Mr. Daniels to the casino but was not aware of what he did afterwards.

Detectives Cline and Clough, Kansas City Police, interviewed Mr. Daniels on June 19, 1997. Although this was the same day that Ms. Smith's body was recovered, her body had not yet been identified.

---

4. Adrian gave inconsistent accounts of which child asked to see Ms. Smith, indicating that it was either his older brother Shaun (who was deceased at the time of trial) or his younger sister Jaloni.

5. The Flamingo Casino is presently the Isle of Capri Casino, located on Frontage Road. The Casino is geographically near the Missouri River and is between the locations where Ms. Smith's car and body were found.

6. Mr. Daniels possessed a piece of property that Ms. Dameron believed she was entitled to, and she testified that she assumed this is what he was referring to.

The two detectives interviewed Mr. Daniels in the security office at the Western Missouri Mental Health Center, his place of employment. Mr. Daniels told the detectives that he had last seen Ms. Smith at his house on Monday, June 9, and that she was upstairs with the children while he was downstairs. He said that Ms. Smith was going to work that morning and to a hair appointment later in the day. Mr. Daniels also stated to the detectives that Ms. Smith would sometimes disappear for periods of twenty-four to forty-eight hours.[7] Both detectives reflected that Mr. Daniels did not seem concerned that Ms. Smith was missing, although she had been missing for ten days.

Mr. Daniels was asked about his work schedule, and he told the detectives that he had called his place of employment and stated that he was ill and would not report for work on Monday, June 9, but he worked the next two days. Mr. Daniels communicated that he worked from 9:00 a.m.–5:00 p.m. on Wednesday, June 11. Mr. Daniel's work records confirmed that he did not work on Monday, June 9, because he reported that he was sick.

During this conversation with the police detectives, Mr. Daniels consented to their search of the house where Ms. Smith lived but not to searches of his house or the Dodge Neon that he had leased for her. The police obtained warrants to search Mr. Daniels' house and car and the Dodge Neon (Ms. Smith's car). The warrants were executed on June 19.

Luminol detects the presence of iron and is used by law enforcement authorities as a precursor test to determine the presence of blood. Luminol tests were performed on locations within Mr. Daniels' house and on portions of both Mr. Daniels' and Ms. Smith's cars. Positive reactions to luminol were detected on the floor mats of Mr. Daniels' car, the back rear seat of Ms. Smith's car, and in different locations throughout Mr. Daniels' home. The carpeting in the den area of the house appeared newer to police than the rest of the carpeting within the house. This carpeting was removed, and the area below the carpeting tested positive when luminol was applied. Records from an area carpet store reflect that Mr. Daniels purchased carpeting on Thursday, June 12.[8] Positive reactions also resulted from luminol testing of the sofa in the den, on the carpet in the dining room, and in the kitchen. Samples were taken from each of the areas that reacted positive to luminol testing.

Various cleaning supplies were found in Mr. Daniels' home and in the trunk of Ms. Smith's car. The mini-blinds in the den of the house appeared newer than a box of mini-blinds found in the house. A receipt on the box indicated that mini-blinds had been purchased on Thursday, June 12. Two credit cards, each issued to Linda C. Daniels, were found at Mr. Daniels' home, and a plastic bag containing $1,300 was found in the rafters of the basement. Tire marks were discovered in the back yard of the house. The police recovered a piece of carpeting that could have been older carpet removed from the den. The police seized two hacksaws, a circular saw, and a chainsaw from Mr. Daniels' basement. Various cleaning supplies were also seized from Mr. Daniels' home along with pieces of furniture.

Laboratory tests to scientifically prove the presence of blood were performed on

---

7. The State presented numerous witnesses who indicated that they never perceived this to be correct.

8. The carpet store was near the location of Mr. Daniels' doctor, and evidence adduced at trial indicated that he had attended a doctor's appointment on that day.

some of the samples seized by the police that had reacted positive to luminol. Chief Police Criminalist in the Trace Evidence Section, Kansas City, Missouri, Police Department Crime Laboratory and supervisor of the Chemistry Section of the Laboratory Frank Booth testified for the defense that all of the laboratory tests conducted at the Police laboratory on the samples tested proved negative for the presence of blood. He said that no blood was present in the samples. All of the untested remaining samples taken from the several locations were inadvertently destroyed by the police and were never tested. Mr. Booth further testified that his investigation of Mr. Daniels' home using Hemastix on areas of the floor where the luminol had tested positive caused him to conclude that no blood was present in those locations except for three areas, which were later proven not to be blood by scientific laboratory testing. (The testimony regarding the luminol is developed more fully below.)

The jury found Mr. Daniels guilty of second-degree murder, and judgment was entered. This appeal followed.

## Points on Appeal

Mr. Daniels claims as his first point on appeal that the evidence presented at trial was insufficient to sustain a conviction, and the trial court erred in overruling his motion for acquittal at the close of all the evidence. Mr. Daniels asserts four additional points, each of which alleges an error in the admission of evidence. Only the third of the four additional points is considered because, of the four evidentiary issues, it is dispositive.

## I. Luminol Evidence

In his third point on appeal, Mr. Daniels asserts that the trial court improperly allowed the State to present as evidence the positive test results obtained when luminol was sprayed in areas of his house and in the cars that he and Ms. Smith owned. No confirming tests for the presence of blood were presented at trial, and Mr. Daniels claims, therefore, that the positive luminol tests were improperly admitted because luminol testing is only scientifically valid as a preliminary test to show that blood may be present and is not scientifically conclusive. The essence of Mr. Daniel's claim is that the introduction of the luminol tests conducted in this case, none of which was corroborated by scientific laboratory testing, effectively represented that the positive test results proved that blood was present in the areas tested. He claims the pre-trial *Frye* hearing that he requested, which was denied, would have demonstrated that the evidence of the positive luminol tests, without subsequent conclusive scientific laboratory testing, were not scientific evidence proving the presence of blood, would have failed the *Frye* test, and would have been deemed inadmissible. Mr. Daniels claims that when the trial court did not grant him a *Frye* hearing as he requested, yet permitted the introduction as evidence of positive luminol tests despite the absence of confirming scientific test evidence that blood was present, the *Frye* standard was violated, and his right to a fair trial was prejudiced.

## Standard of Review

A trial court has broad discretion to admit or exclude evidence at trial. *State v. Madorie*, 156 S.W.3d 351, 355 (Mo. banc 2005). This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. *Id.* In determining whether the trial court abused its discretion, the applicable test for admission of expert testimony is considered.

Despite application of the test for admission of expert testimony in civil cases articulated by section 490.065, RSMo 2000, and discussed in *State Board of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 160 (Mo. banc 2003),

 Missouri courts, in criminal cases, still follow the test articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), for the admission of scientific evidence. *See Butler v. State*, 108 S.W.3d 18, 26 (Mo.App. W.D.2003). To admit the testimony of an expert witness or the results of scientific procedures in a criminal case, "the testimony must be based on scientific principles that are generally accepted in the relevant scientific community." *Id.* (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993)). *See also State v. Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). Whether a procedure has gained acceptance in the relevant field and is admissible scientific evidence is established in a *Frye* hearing—that is a hearing held outside of the presence of the jury. *State v. Salmon*, 89 S.W.3d 540, 543 (Mo.App. W.D.2002).

### Discussion

Mr. Daniels first raised an objection to the State's presenting as evidence the positive luminol test results in a motion in limine, which the court took under advisement and then overruled without explanation. Mr. Daniels then requested a *Frye* hearing on the issue of whether the luminol evidence scientifically proved the presence of blood, which the trial court also refused. Before each of the two investigating crime scene technicians testified about their use of luminol in Mr. Daniels' house and two vehicles, Mr. Daniels renewed his objection, properly preserving for appeal his objections.

At trial, the two Crime–Scene Technicians (CST) who used luminol at the various places of investigation testified about the luminol test results. The State first presented the testimony of Kansas City Police Department CST Sam Willins, who executed the January 19, 1997, warrant allowing the search of Mr. Daniels' and Ms. Smith's cars. As described by CST Willins, "[l]uminol is a chemical that responds to blood. And you can't wipe enough blood up to get where luminol won't find it. You can clean an area a million times or years later [sic]. If blood was there, luminol will find it." CST Willins, when further questioned, clarified that luminol is a "presumptive test" for blood and that scientific testing in a laboratory is required to confirm the presence of blood. CST Willins testified that luminol luminesces when it contacts blood and conclusively establishes the absence of blood when it does not luminesce.

Police investigators obtained no positive scientific confirmatory test results for the presence of any blood, human or otherwise, on any of the items that tested positive when luminol was applied. Although some of the items that tested positive when luminol was applied were tested in a laboratory using scientific tests, not all of the items were tested. The positive luminol test items removed from Mr. Daniels' house that were tested in the laboratory proved scientifically to not be blood. No confirmatory tests were ever performed on any of the items seized from Mr. Daniels' and Ms. Smith's vehicles. Yet, CST Willins was permitted to testify that positive luminol reactions were found on the "whole interior" of Mr. Daniels' car, most notably on the floor mats, as well as in several areas of his house, including the kitchen, hallway, and den. Positive luminol reactions were identified in the "rear interior," the back seat, and the trunk of Ms. Smith's

car. CST Willins then testified that various cleaning supplies were located within the trunk, along with miscellaneous papers that were seized for further testing. He acknowledged that no hemastix tests were ever performed on the two automobiles.[9] CST Willins acknowledged during cross-examination that luminol does not conclusively demonstrate the presence of blood. He testified that he had not taken photographs of the areas tested; and he had no recollection of the size, pattern, or specific location of the areas that tested positive when luminol was applied.[10]

The State also presented the testimony of the second crime scene technician, CST Diane Lutman, who conducted the initial luminol testing at Mr. Daniels' home. CST Lutman had worked as a crime scene technician for "almost 13 years," and had used luminol in the field "a hundred times or more." CST Lutman testified that luminol is generally accepted as a presumptive test for the presence of blood. She then testified that positive luminol reactions occurred on the floor of the den of Mr. Daniels' home, on the underside of the carpeting, on the sofa, chair, and footstool of the same room. Positive luminol results were also found in the dining room and kitchen. For each of these rooms, CST Lutman testified that the luminol tested positive "for blood." When asked to clarify her conclusion that the luminol tested positive for blood, CST Lutman explained, "I wasn't positively sure, but I was relatively sure." Despite the necessity for scientific laboratory testing to confirm the presence of blood, CST Lutman explained that she took no confirmatory samples from any of the floors and that only carpet fibers were taken from the den for laboratory testing.

Each of the two testifying CSTs acknowledged that their expertise was limited to application of luminol and that neither was qualified to testify about the scientific certainty of luminol testing confirming the presence of blood. Each of the technicians also testified that Frank Booth, Chief Criminalist of the Trace Evidence Section of the Kansas City, Missouri, Police Department Crime Laboratory, is an expert regarding the scientific confirmatory laboratory tests used to prove the presence of human blood.

Chief Criminalist Frank Booth was the only scientific expert to testify about confirmatory laboratory tests used to prove the presence of human blood at a crime scene. Mr. Booth was called by the defense. When asked to explain the concept of presumptive testing for blood, Mr. Booth responded:

[P]resumptive tests are things that react with blood. But they also react with other things. It's not selective to blood. But since you can get a reaction with this presumptive test, you know blood is one of the things it could be. There's a number of kinds of tests ...

Luminol is also a presumptive test for blood. What happens if you have a room full of darkness, in the dark, and you spray luminol over an area that has blood in it, it will react with the blood and produce a blue light. So I can see now I have got an area that is emanating this light. And I know that that area is something I need to investigate.

Other things also react with luminol. It's actually reacting with the iron that's

---

9. Hemastix, like luminol, is used by criminolists as a precursor test to indicate the possible presence of blood.

10. The State also presented the testimony of Detective Ray Staley, who provided the foundation for photographs taken of the luminol pattern discovered in Ms. Smith's car.

in the blood. That's what is reacting. That is what is causing the reaction. But bleach will react with luminol and it doesn't have any iron in it. But the reaction is different. It's kind of a bright light. It's kind of a flashy kind of reaction. That's positive. But it's different from what you see with blood. If you're experienced at spraying luminol on a scene, you would be able to differentiate that kind of a reaction.

Mr. Booth was further asked if luminol could be utilized to conclusively determine the presence of blood, and he replied, "I would say no; more testing would have to be done. And you'd have to take into account also the pattern." Mr. Booth described the actual forensic operating procedure differently from the earlier crime scene technicians, stating that ordinarily two presumptive tests are required during field investigations before a conclusive laboratory test is conducted—the positive reaction to luminol as well as a positive reaction to hemastix. Mr. Booth described hemastix as a medical product used to detect blood in urine that is also widely used as a forensic tool. He said that to "presume" blood is present, crime scene technicians do a secondary hemastix test to areas that have tested in the luminol test. He asserted that only when both tests are positive is evidence presumed to be blood, and even then no scientific conclusions can be reached definitely indicating that blood is present. According to Mr. Booth, a scientific conclusion that blood is present where luminol has reacted positively requires scientific laboratory-testing confirmation, and luminol testing without appropriate confirmation does not conclusively determine the presence of blood. Thus, Mr. Booth's testimony is that luminol is a chemiluminescent (gives off light via a chemical reaction) when it contacts iron. The iron in hemoglobin, the oxygen-carrying protein in red-blood cells, causes luminol to luminesce. Luminol reacts to other metals, paints, cleaning products, bleach, and plant matter, also, however. Luminol's reaction to each differs in intensity. Luminol's value is that it shows investigators where blood might be. Other tests are required to verify that the substance is blood and that the blood is human blood.

When the court considered before trial both the motion in limine and the motion for a *Frye* hearing, the State argued that luminol testing was widely accepted in the scientific communities as a preliminary test for the presence of blood. The court permitted introduction of the positive luminol test results. The testimony of the two crime scene technicians and Chief Criminalist Frank Booth substantiated that luminol testing is an initial test in determining the presence of blood. Mr. Booth, the only expert who testified regarding scientific laboratory testing to prove whether blood was present in any samples submitted, testified that luminol testing is preliminary only, and it is not administered to prove scientifically the presence of blood. Rather, he claimed that additional laboratory testing is required to make that conclusion. While a negative luminol test demonstrates the absence of blood, a positive luminol test indicates that blood may be present, and additional testing is required. No Missouri cases assert that luminol testing meets the *Frye* test when offered as *conclusive* proof of the presence of blood. Therefore, while positive luminol test results may satisfy *Frye* if offered only for the limited purpose of being a preliminary test for the presence of blood when additional scientific tests confirm the presence of blood, certainly a *Frye* hearing is necessary to determine whether a positive luminol reaction conclusively proves the presence of blood without scientifically accepted corroborative evidence.

In this case, the State introduced evidence through the testimony of CST Willins and CST Lutman that luminol tests were positive in Mr. Daniels' house and in his and Ms. Smith's cars for the presence of blood. No subsequent scientific tests were introduced to corroborate the luminol test because several of the items removed from the various scenes were lost or misplaced by the police, and the items tested in the laboratory proved that blood was not present. Despite the acknowledgments of CST Willins and CST Lutman that luminol is only a preliminary test to show that blood may be present, both CSTs were allowed to opine that the positive luminol test results of items in Mr. Daniels' home, his car, and Ms. Smith's vehicle indicated that blood was present. Introduction of this evidence could only have been offered to persuade the jury that blood was present, that it was the victim's, and that the volume and the pattern that tested positive were evidence of the defendant's guilt. Thus, the introduction of the luminol tests without corroborative test results implied to the jury that Ms. Smith's blood was present at the locations tested. Introduction of the positive luminol tests were offered to effectively prove the presence of human blood without first conducting a *Frye* hearing to determine whether such evidence satisfied the *Frye* test and constituted an abuse of discretion and error that prejudiced Mr. Daniels.

The State further compounded the prejudice by commenting in its closing argument that the several positive luminol test results were proof that blood was present in Mr. Daniels' house and his and Ms. Smith's cars, the natural implication being that the blood was Ms. Smith's. The trial court had admonished the prosecutor before closing argument to restrict his comments from exceeding what the positive luminol tests proved. Yet, the prosecuting attorney said:

Mr. Booth can certainly tell you that from the few carpet fiber samples that he took in that one small area of a long stretch of carpeting in the dining room, he saw no particles of blood microscopically.

But he can't tell you that there is no blood or was no blood in the defendant's house because he can't tell you that there are no atoms of blood present. Atoms are smaller than the particles he can see under the microscope. *He can't see the atoms but the luminol is so sensitive that it can show us the blood atoms that are present or were present after a surface has been cleaned.* Mr. Booth, Sam Willins, and Diane Lutman all told you how sensitive luminol is. You learned from Mr. Booth that the atoms of iron in blood can be realized by using luminol where a microscope cannot.

They all told you that blood can be cleaned away, but you can't hide from luminol, whether it be blood on a surface like this or blood on a surface like carpeting. It can be cleaned away such that particles are gone. *But the smaller, undetectable, microscopically undetectable atoms are still present and those react to luminol . . .*

Now lastly, Mr. Booth told you that he didn't think it was a crime scene because he found no blood. That's just plain ridiculous. *It's more likely than not that what the luminescence reveals is blood.* But if there is no blood at the defendant's house, it's very plausible that it had all been washed away with the cleaning chemicals and supplies that he had at his house. (emphasis added)

Reasonable inference from the State's closing argument is that the luminol testing in this case is not simply a presumptive test to determine that blood may be pres-

ent; it is a conclusive test demonstrating the presence of Ms. Smith's blood. Introduction of the positive luminol tests without a *Frye* hearing as Mr. Daniels requested to determine the scientific viability of a positive luminol test without confirming scientific testing as proof of the presence of blood was prejudicial. Indeed, the few laboratory tests conducted on items that had responded positively to luminol proved to a scientific certainty that blood was not present. And the State's closing argument effectively encouraging the jury to rely on the presumptive positive luminol tests as proof for the presence of blood and to disregard the evidence that the conclusory laboratory tests proved scientifically the absence of blood exacerbated the errant and prejudicial introduction of the positive luminol test results. The only rational purpose for the introduction of the uncorroborated luminol tests and in presenting the argument made by the State was to persuade the jury that the tests demonstrated Ms. Smith's blood was present in Mr. Daniels' house and in his and her vehicles in quantities and in a pattern that demonstrated Mr. Daniels' guilt in Ms. Smith's murder.

The evidence of the positive luminol tests absent confirmatory scientific testing without satisfying *Frye* that a positive luminol test, without scientific corroboration, proves the existence of blood prejudiced Mr. Daniels' right to a fair trial. The trial court abused its discretion in failing to conduct a *Frye* hearing as requested by Mr. Daniels and in permitting the introduction of the positive luminol test results, effectively as proof for the presence of human blood in Mr. Daniels' house, his and Ms. Smith's cars. The point is granted.

## II. Sufficiency of the Evidence

Mr. Daniels contends as his first point on appeal that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to prove beyond a reasonable doubt that a murder had occurred or that the he had committed it. Because Mr. Daniels' right to a fair trial was prejudiced, if substantial evidence was presented by which a reasonable juror could find Mr. Daniels' guilty of the crime charged, the case will be remanded for a new trial. If substantial evidence was not presented, Mr. Daniels is entitled to reversal of the conviction and is not required to sustain a second trial.

When reviewing the sufficiency of the evidence, all the evidence and its inferences are considered in a light most favorable to the verdict. *State v. Myszka*, 963 S.W.2d 19, 22 (Mo.App. W.D.1998). Inferences contrary to the verdict are rejected unless they are such a logical extension of the evidence that no reasonable juror could disregard them. *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004), *cert. denied*, 285 U.S. 1059, 125 S.Ct. 872, 160 L.Ed.2d 786 (2005). Great deference is given to the trier of fact, and an appellate court is not to act as a "super juror" with veto power over a verdict. *State v. Ellison*, 980 S.W.2d 97, 98 (Mo. App. W.D.1998). The reviewing court does not weigh the evidence nor determine the reliability or credibility of witnesses, but limits its review to whether the jury had substantial evidence from which to find the defendant guilty beyond a reasonable doubt. *Myszka*, 963 S.W.2d at 22.

All of the elements of a homicide case, including the *corpus delicti*, may be proved through circumstantial evidence. *See Id.* at 23. "Even where evidence of a defendant's guilt is solely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt."

*State v. Bragg,* 867 S.W.2d 284, 290 (Mo. App. W.D.1993)(citing *State v. Grim,* 854 S.W.2d 403, 406 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993)).

 Mr. Daniels first argues that the State failed to meet its burden in that it failed to prove the *corpus delicti* of the crime. "The *corpus delicti* in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death." *State v. Edwards,* 116 S.W.3d 511, 544 (Mo. banc 2003), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). The State presented ample evidence proving each of these elements. The body of Ms. Smith was discovered and recovered in a mutilated condition after being thrown into the Missouri River. Evidence of concealment of a homicide is sufficient to create the inference that the victim died as the result of a criminal agency instead of an accident, even in cases where the cause of death is indeterminable. *See e.g. State v. Ellison,* 980 S.W.2d 97, 101–02 (Mo.App. W.D. 1998).

 Mr. Daniels next claims that the State failed to prove him guilty of Ms. Smith's murder beyond a reasonable doubt. Proof of the *corpus delicti* alone does not suffice for conviction, as evidence must still be presented tying decedent's death to an act of the defendant. *State v. May,* 689 S.W.2d 732, 735 (Mo.App. W.D. 1985). The evidence, excluding the luminol tests and its inferences that favor the verdict of Mr. Daniels' guilt, is that he had an amorous relationship with Ms. Smith for about four years. Ms. Smith and her children were with Mr. Daniels in his house the night before her disappearance, and he apparently was the last person to see her alive. When Ms. Smith's children asked Mr. Daniels where their mother was when they awakened Monday morning, Mr. Daniels told him that she had gone to work. Yet, Ms. Smith's ten year old son saw his mother's car parked near the house that same morning, and the vehicle was found several days later in the River Market area of Kansas City, an area principally of commercial shops and businesses within about a quarter mile of the Missouri River. Additionally, Ms. Smith's employment ID, needed for her employment was found at her residence on Wednesday, June 11 when Mr. Daniels provided a key to the residence to Mr. Smith. Mr. Daniels made several inconsistent statements to Ms. Smith's ex-husband regarding the last time he saw Ms. Smith. Mr. Daniels also stated to Ms. Smith's ex-husband that Ms. Smith had informed him she was going to the hair stylist Monday afternoon. The hair stylist is closed on Mondays. Monday evening, Mr. Daniels called an acquaintance and asked for and later received a ride from the Flamingo Casino. The Flamingo Casino is within short walking distance from the Missouri River and is west and "up-river" (the current flows east) from the location where Ms. Smith's torso was found several days later. When he entered his friend's car, Mr. Daniels apparently was tired, his pants and shoes had dried mud on them, and he emitted a foul odor. He was driven to his car, which was parked about forty blocks south in Kansas City.

On June 11, Mattie Kyles, a co-worker, observed Mr. Daniels walking on Admiral Blvd. in Kansas City, Missouri. He was within a mile or two of the River Market area of Kansas City, where Ms. Smith's car was found a few days later. Mr. Daniels told Ms. Kyles that his car had broken down at the Flamingo Casino "the other night" when he and Ms. Smith were at the casino and requested a ride to that location. Despite his relationship with Ms.

Smith and her children, Mr. Daniels failed to report Ms. Smith's disappearance to police authorities any time before the police confronted him, and he appeared unconcerned to the inquiring detectives on June 19 when they interviewed him, ten days after Ms. Smith's disappearance. Finally, Mr. Daniels replaced the carpeting and mini-blinds in the den of his house while Ms. Smith was missing. Two of Ms. Smith's credit cards were obtained from Mr. Daniels' home.

Considering the totality of the evidence, the State presented substantial evidence by which a reasonable juror could find Mr. Daniels guilty of the crime charged. The point is denied.

### Conclusion

The trial court abused its discretion by permitting the introduction of the luminol tests effectively to prove the presence of Ms. Smith's blood in Mr. Daniels' home and in his and Ms. Smith's vehicles without having first conducted a *Frye* hearing, as requested by Mr. Daniels, prejudicing his right to a fair trial. The judgment of conviction is reversed, and the case is remanded for a new trial. Mr. Daniel's motion for a *Frye* hearing before trial was to contest the introduction of positive luminol test results at trial to prove the presence of blood without corroborating scientific evidence. Should the State intend to introduce a positive luminol test result at trial to prove the presence of blood, absent corroborating scientific evidence, the trial court is directed to conduct a *Frye* hearing. Mr. Daniels is not limited to the objection previously made, and he may assert any relevant objection to the introduction of the luminol test results on the basis that the *Frye* standard is not satisfied.

EDWIN H. SMITH, C.J. and PATRICIA A. BRECKENRIDGE, J. concur.