**STATE of Missouri, Respondent,**

v.

**Eric L. HOPPER, Appellant.**

**No. SD 30201.**

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 23, 2010.

Kent Denzel, Columbia, MO, for Appellant.

Chris Koster, Attorney General and Jamie Pamela Rasmussen, Assistant Attorney General, Jefferson City, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

A jury convicted Eric L. Hopper ("Appellant") of second-degree murder in violation of section 565.021[1] and abuse of a

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

child in violation of section 568.060.[2] Appellant was sentenced to two concurrent terms of twenty years' imprisonment. This appeal followed. We affirm the trial court's judgment.

## Factual and Procedural History

Because Appellant challenges the sufficiency of evidence establishing the cause of the victim's death, it is necessary for us to review in some detail the evidence adduced at trial. The following evidence is summarized in the light most favorable to the verdict. *State v. Croka*, 693 S.W.2d 133, 134 (Mo.App. W.D.1985).

Appellant's son ("T.M.") was four months old in December 2006. On December 1, 2006, Angela Snider, T.M.'s mother, took T.M. to the doctor because he had some congestion. The doctor found no other injuries or ailments. Ms. Snider also noted T.M. had no bruises, cuts, or scrapes on his face or body.

On December 2, 2006, at approximately 8 a.m., Appellant picked T.M. up from Ms. Snider for visitation. Appellant took T.M. to his home where they played for awhile. At some point, Appellant gave T.M. a small amount of methamphetamine residue to keep T.M. awake to play. T.M. then took a nap. When T.M. woke up, he was fussy and crying. Appellant changed his diaper and then tried to feed him. T.M. would not eat and made a mess. Appellant admitted he was aggravated and washed T.M.'s hands and face roughly, then let him cry in his walker while he had a cigarette. Appellant then placed T.M. on the floor. Two times T.M. started to fall over and two times Appellant pushed him upright. Both times T.M. struck his head against the hard wooden sofa frame. After the second blow to his head, T.M. got a dazed look in his eyes. Appellant picked T.M. up and sat with him in his recliner until he noticed T.M.'s face was getting cold. At that point, Appellant contacted his mother, Glenda Queen, because T.M. was unresponsive.

Ms. Queen arrived and subsequently took T.M. to her house. Appellant left and went to his neighbor's house. Ms. Queen's daughter summoned Cindy Shaffer, a neighbor, and told her she thought T.M. was dead. Ms. Shaffer called 911 and was instructed on how to perform infant CPR. She noticed T.M. "had red splotches all over his face, his nose was red, and he had like red little patches all over his cheeks, his chin, forehead" and that he "was really cold, kind of almost a blue, just really cold." Two police officers arrived and began driving T.M. to the hospital; he was transferred to an ambulance en route. The emergency medical technician observed: T.M.'s skin was pale and cold to the touch; he was unresponsive; and T.M. was showing no signs of life. T.M. was pronounced dead shortly after arrival at the hospital.

Investigators spoke with Appellant that same afternoon. They informed him of his *Miranda* rights, and Appellant agreed to speak with them.[3] Appellant explained he picked T.M. up at 8 a.m. that morning and played with his son for a couple of hours before putting him down for a nap. Appellant said T.M. was fussy when he woke up from the nap and he accidentally dropped T.M. in the kitchen on the linole-

---

**2.** Count I alleged Appellant "knowingly caused the death of [T.M.] by striking the victim's head on a hard surface" and count II alleged Appellant "knowingly inflicted cruel and inhuman punishment upon [T.M.], a child less than seventeen years old, to wit; 4 months, by striking his head repeatedly on a hard surface, fracturing the child's skull, and thereby caused the death of the child."

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

um floor while he was fixing a bottle. Appellant said he called his mother when he noticed T.M. had "a dazed look in his eyes."

Forty-five minutes to an hour later, investigators again questioned Appellant after having learned T.M.'s head injuries were severe and did not appear to have been the result of being dropped on the floor "from a limited distance." Appellant recounted a similar story through T.M.'s nap. He added that the injury to T.M.'s nose could have occurred when he flipped T.M. over while changing his diaper and T.M. rubbed his face into the blanket on the floor. He repeated he had dropped T.M. on the kitchen floor. Appellant said T.M. took the bottle briefly, then refused it, so he put the baby on the floor and tried to get him to play. Appellant told investigators T.M. started to fall over and when Appellant pushed him upright, T.M. hit his head against a wooden part of the sofa frame; T.M. fell a second time and when Appellant pushed him against the sofa, T.M. again hit his head. Subsequently, Appellant agreed to give a video statement.

After investigators received partial autopsy results, Appellant was again questioned. The investigator told Appellant T.M.'s injuries were "very very serious" and he did not believe Appellant had told him the truth. Again, Appellant recounted a similar story through the point of T.M.'s nap. Appellant then told investigators: he was tired; things were not going well at work as his job was seasonal, it was ending, and he had bills to pay; T.M. woke up from his nap crying; and he took T.M. from the sofa where he was napping, put him forcefully down on a blanket to change him, and when he flipped T.M. over by the ankles, T.M. landed on his face instead of his belly as he had intended. The rest of Appellant's story—changing T.M.'s diaper,

dropping him while in the kitchen fixing a bottle, and twice pushing him against the sofa so that T.M. struck the back of his head—was the same as Appellant had previously described. Appellant added that after T.M. struck his head the first time, he continued to cry but after he struck his head the second time, T.M. got a dazed look in his eyes. Appellant picked T.M. up and sat with him until he noticed T.M.'s face getting cold. He then called his mother because he thought something was wrong.

During the investigation, Appellant was told toxicology reports were requested and he was asked whether he had given T.M. any drugs. Appellant then responded for the first time that on the morning of T.M.'s death, he had taken a small amount of methamphetamine residue from a "snort" tube (a white piece from an old ink pen) he had lying around and placed it on T.M.'s tongue so T.M. would be able to stay awake and play. Appellant also told investigators he was a regular methamphetamine user, and had been using marijuana and methamphetamine the previous day.

Prior to trial, Appellant filed a motion in limine to exclude any evidence regarding his admission that he placed a small amount of methamphetamine on T.M.'s tongue. During pre-trial proceedings, the trial court ruled the evidence would be admissible because it occurred around the same time T.M.'s injuries were sustained. Before opening statements, Appellant renewed his objection and the trial court reaffirmed its ruling. The trial court recognized it as a continuing objection.

At trial, the State called witnesses Angela Snider, Glenda Queen, Cindy Shaffer, the police officer who transferred T.M. to the ambulance, the emergency medical technician who performed CPR on T.M., and two investigators who questioned Ap-

pellant. These witnesses testified as to the events recounted above. The video statement of Appellant was also played for the jury.

Additionally, forensic pathologist Dr. Russell Dietaker ("Dr. Dietaker") described the results of the autopsy and presented photographs of T.M.'s injuries. Dr. Dietaker testified T.M. had numerous abrasions on his face and head, as well as bruising on his arms consistent with being gripped. T.M. also had a large bruise on the back of his head, a broken rib, and internal bruising of the abdominal area. Dr. Dietaker also explained there was "quite extensive bruising underneath the scalp." T.M. had two skull fractures. The fracture on the right side of his head was large and branching, indicating a significant amount of force had been applied to T.M.'s head. Additionally, Dr. Dietaker stated there "was a collection of blood over the cerebral compression, convexity, or over the top of there was a liquid layer of substance. There's also subarachnoid hemorrhage, which is a bleeding on the surface of the brain itself." T.M. sustained damage to his optic nerves and retinal areas and Dr. Dietaker explained all these findings as indications of significant force.

Dr. Dietaker was of the opinion that a five-foot drop onto a linoleum floor would not have caused the described injuries. He testified:

> [I]]f it were a fall, it would be a fall from a significant height, 10 or 20 feet or more. If it were a blow, it would have to be a significant blow. Not a slap. This could either be a punch, or alternatively the child being struck into something. I can't say specifically whether there was a blow applied to the head, or the head was forced into something, but, in either instance, it would be significance [sic] force applied.

Dr. Dietaker explained the two fractures indicated more than one impact was involved, but he could not be absolutely sure as a very quick significant blow such as a car accident or a very heavy object such as a television could also have created both fractures. Dr. Dietaker again noted a "single drop from that distance, wouldn't have caused those fractures." Dr. Dietaker was never specifically asked his opinion as to the cause of T.M.'s death.

Prior to the close of the State's case, the parties announced a stipulation regarding the results of T.M.'s toxicology tests. The following stipulation was read to the jury and they were told it was a part of the record in the case:

> The toxicology report shows that no amphetamines were found in [T.M.'s] system. If the toxicologist were to testify, he would say that this finding could mean that methamphetamine residue was placed on [T.M.'s] tongue, and not absorbed into his system, or it could mean that methamphetamine residue was not placed on [T.M.'s] tongue.

Appellant maintained T.M.'s injuries were accidental and that Appellant's statements were the product of coercive police interrogation. In support of this theory, Appellant presented the testimony of psychologist Dr. Thomas Blansett, who had evaluated him prior to trial. Dr. Blansett opined that Appellant was highly susceptible to suggestion and likely would yield to someone in authority, like a police officer. In rebuttal, the State presented psychologist Dr. Byron English, who rejected Dr. Blansett's opinion regarding Appellant's tendencies when confronted by authorities.

Appellant testified in his own defense. He stated that while it was true he dropped T.M. on his head, he denied the other events he confessed to police, including putting methamphetamine residue on T.M.'s tongue. He claimed he told police

those things only because they were yelling at him and did not seem to believe his story about how T.M. was injured. He further testified he never intended to harm his son.

The jury convicted Appellant of second-degree murder and abuse of a child resulting in death.

Appellant contends the trial court erred in: (1) overruling his motion for judgment of acquittal because there was insufficient evidence demonstrating the cause of T.M.'s death; and (2) admitting the evidence Appellant placed methamphetamine on T.M.'s tongue as it was inadmissible, uncharged misconduct, and deprived him of a fair trial. The issues for determination are:

1. Was there sufficient evidence to prove the injuries Appellant inflicted on T.M. caused his death ?

2. Was it an abuse of discretion to admit evidence showing Appellant placed methamphetamine residue on T.M.'s tongue ?

### *Sufficient Evidence to Show Cause of Death*

In Appellant's first two points, he contends the trial court erred in overruling his motion for judgment of acquittal and in entering a judgment of guilty on both counts in that the evidence was insufficient to establish, beyond a reasonable doubt, Appellant caused T.M.'s death because no expert opinion was offered as to the cause of T.M.'s death. It is significant to note that Appellant admits "he caused [T.M.'s] injuries" and only disputes whether the

jury was entitled to infer those injuries were the cause of T.M.'s death.

### Standard of Review

When reviewing a challenge to the sufficiency of the evidence, we determine whether there is sufficient evidence from which a reasonable juror could have found Appellant guilty beyond a reasonable doubt. *State v. Langdon*, 110 S.W.3d 807, 811 (Mo. banc 2003). We must consider the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence, while disregarding contrary inferences "unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." *Id.* This Court may " 'not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences.' " *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (quoting *Bauby v. Lake*, 995 S.W.2d 10, 13 n. 1 (Mo.App. E.D.1999)). "We defer to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony." *State v. Davis*, 219 S.W.3d 863, 866 (Mo.App. S.D.2007).

### Analysis

Appellant was charged with second-degree murder in violation of section 565.021.1(1) [4] and abuse of a child resulting in death in violation of section 568.060.3(2).[5] Thus, to sustain Appellant's convictions as to both counts, the State had to prove Appellant's conduct caused T.M.'s death. "Circumstantial evidence

---

**4.** To sustain a conviction for second-degree murder, the State must introduce evidence allowing a reasonable inference that the defendant knowingly caused the death of the victim. § 565.021.1(1).

**5.** To sustain a conviction for abuse of a child, the State must adduce evidence that the de-

fendant knowingly inflicted cruel and inhuman punishment on a child who was less than seventeen years old. § 568.060.1(1). The crime is a class A felony if the child dies as a result of the injuries sustained. § 568.060.3(2).

may be sufficient if the facts in evidence are such that every person of average intelligence would know that the wound was mortal in character." *Croka*, 693 S.W.2d 133 at 135. Expert testimony from a physician is not always required to prove cause of death. *Id.*

In viewing all the evidence and reasonable inferences in favor of the verdict, we find it reasonable to conclude that every person of average intelligence would know from experience or general knowledge that the injuries inflicted by Appellant upon T.M., an infant, were mortal in character. Although Dr. Dietaker failed to specifically offer an opinion as to the cause of T.M.'s death, the circumstantial evidence permits an inference of a causal relationship between T.M.'s injuries and his death so as to support the verdict. This evidence includes: (1) the physician's finding that T.M. was without injury or ailment other than congestion the previous day; (2) Appellant's statements regarding T.M.'s appearance and demeanor before and after Appellant struck T.M.'s head against the hard surface; (3) other witness testimony that T.M. remained lifeless after the blows to his head; (4) Dr. Dietaker's extensive testimony regarding the seriousness of T.M.'s injuries; and (5) Dr. Dietaker's conclusion as to the force necessary to inflict such injuries.

In addition to the testimony that showed the severe consequence of the blows to T.M.'s head, Dr. Dietaker described the severity of T.M.'s head injuries, internally and externally, and presented photographs of these injuries. Specifically, Dr. Dietaker testified T.M. had a large bruise on the back of his head, extensive bruising under the scalp, and two skull fractures. The fracture on the right side of T.M.'s head was described as "large and branching." He also stated there "was a collection of blood over the cerebral compression, con-

vexity, or over the top of there was a liquid layer of substance ... and bleeding on the surface of the brain itself." Dr. Dietaker testified there was also damage to the optic nerves and retinal areas.

Significantly, Dr. Dietaker testified to the substantial force necessary to cause these injuries and concluded a drop onto a linoleum floor from five feet could not have caused the described injuries, but rather required a fall from a significant height, or a significant blow, which might include T.M. being struck into something. He concluded these injuries were a result of a significant amount of force being applied to T.M.'s head. He further explained that the two fractures indicated more than one impact was involved, although he opined a very quick significant blow, or a very heavy object, could also create both fractures.

T.M.'s mother testified T.M. had no bruises, cuts, scrapes or scabs before he was left with Appellant. Multiple lay witnesses testified to T.M.'s state before and after he sustained the severe head injuries. Furthermore, Appellant explained some of the normal infant behaviors T.M. exhibited just before sustaining the head injury; i.e., playing, napping, crying, and squirming.

Notably, Appellant noticed an immediate change in T.M. after the second time Appellant struck his head against the hard surface. Appellant noticed T.M. "didn't have any movement" after that. Appellant stated the first time he struck T.M.'s head against the sofa he continued to cry, but after the second time he struck T.M.'s head, T.M. got a dazed look in his eyes and Appellant soon noticed his face was getting cold. At this time, Appellant himself recognized something was seriously wrong with T.M. Ms. Queen's daughter observed T.M. appeared to be dead. Ms. Shaffer, the neighbor who performed CPR on T.M., also noticed T.M. "was really cold, kind of

almost a blue, just really cold." The emergency medical technician continued CPR on T.M. until he arrived at the hospital, where he was pronounced dead shortly thereafter. The direct observations of witnesses demonstrated T.M. immediately became unresponsive and never showed any sign of life after the second impact of T.M.'s head on the hard surface.

Appellant testified he never intended to harm his son and that while he did drop T.M., he had fabricated some of his other statements to investigators. Nevertheless, we are required to give deference to the jury's credibility decisions. *State v. Herrington*, 315 S.W.3d 424, 425 (Mo.App. S.D.2010). Unlike the reviewing tribunal, which only sees the cold record and does not have the opportunity to judge the witnesses who gave testimony, the jurors were able to view first-hand all the witness testimony placing them in a superior position to determine witness credibility and the weight and value of their testimony. The jury was entitled to believe some, all, or none of the testimony of witnesses when arriving at their verdict. *Id.*

In this day and age, a person of average intelligence would know that a severe and significant blow to an infant's head could be mortal. T.M., a four-month-old infant, did not sustain a simple skull fracture. T.M. had multiple fractures, extensive bruising under the scalp, and bleeding on the surface of his brain. These extensive injuries required a *significant* amount of force to inflict. Witnesses, and Appellant himself, testified to the dramatic effect Appellant's actions had on T.M. as he was

a healthy infant crying and playing until the second time Appellant struck his head against a hard surface causing his eyes to become dazed, and his body to turn cold, blue and lifeless. We are persuaded the totality of evidence adduced regarding the cause of T.M.'s death allows every person of average intelligence to conclude, without the benefit of unreasonable, speculative or forced inferences, that the head injuries caused by Appellant were mortal for T.M.

Appellant attempts to distinguish this case from *Croka*, and *State v. Harris*, 870 S.W.2d 798, 811 (Mo. banc 1994), because those cases involved a gunshot wound, producing almost immediate death to the victim, unlike these facts.[6] We find Appellant's attempt to distinguish the cases on the grounds that a gunshot is more serious than continually striking an infant's head on a hard object with a significant amount of force unavailing. Appellant argues that "evidence of consequences following immediately upon the shooting is not present in this case." In *Harris*, the medical examiner failed to testify the gunshot the victim sustained caused his death. Nevertheless, the Missouri Supreme Court found the medical examiner's testimony about the effects of the gunshot on the victim, coupled with eyewitness testimonies about victim's reaction after being shot, and the fact the victim was dead before paramedics were summoned, was sufficient to support the conviction when all evidence and inferences properly drawn from it were considered. *Id.* at 811. Here, the evidence of the consequences following Appellant's actions are comparable—T.M. became unre-

---

6. Appellant also aims to distinguish this case from three others in which a conviction was rendered without direct evidence of the cause of death. *See State v. Ellison*, 980 S.W.2d 97 (Mo.App. W.D.1998), *State v. Hayes*, 15 S.W.3d 779 (Mo.App. S.D.2000), and *State v. Daniels*, 179 S.W.3d 273 (Mo.App. W.D.2005). However, we find it unnecessary to address these three cases, as each involves an act of concealing or mutilation of the body in an attempt to cover up the killing. Since there is evidence of the immediate consequence of Appellant smashing T.M.'s head on a hard surface, it is unnecessary to compare these cases.

sponsive immediately after Appellant struck his head the second time and never showed any signs of life thereafter.

We find the totality of evidence adduced regarding the cause of T.M's death was sufficient to prove the injuries Appellant inflicted on T.M. caused his death. Thus, when all the evidence and inferences properly drawn from it are considered, sufficient evidence exists to support the conviction. Points I and II are denied.

### No Erroneous Admission of Evidence

Next, Appellant contends the trial court abused its discretion by admitting into evidence testimony that Appellant put methamphetamine residue on T.M.'s tongue in that it was evidence of uncharged misconduct neither logically nor legally relevant to prove Appellant struck T.M.'s head against a hard surface, and it did not fit within any exception to the prohibition against introducing evidence of uncharged crimes. He further argues that even if it did have some probative value, it was greatly outweighed by its prejudicial effect. The State contends: (1) the evidence was relevant as part of the circumstances directly surrounding the crime; (2) the evidence controverted Appellant's testimony that T.M.'s injuries were the result of an accident; and (3) Appellant was not prejudiced in that there was overwhelming evidence of his guilt.

### Standard of Review

"The trial court is vested with broad discretion to admit and exclude evidence at trial, and this Court will find error only if the lower court's discretion was clearly abused." *State v. Colvin,* 312 S.W.3d 436, 438 (Mo.App. S.D.2010). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of jus-

tice and indicate a lack of careful consideration. *Id.* Furthermore, we review the trial court's decision not merely for error, but for prejudice, and will reverse only if the error was so prejudicial that it deprived Appellant of a fair trial. *Id.* In order to prove that error was prejudicial, a defendant must show a reasonable probability that absent such evidence, the verdict would have been different. *State v. Tillman,* 289 S.W.3d 282, 294 (Mo.App. W.D.2009).

### Analysis

A criminal defendant has the right to be tried only for the crime charged, and for this reason, the general rule is that evidence of uncharged crimes or prior misconduct is not admissible at trial unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. *State v. Vorhees,* 248 S.W.3d 585, 587 (Mo. banc 2008). However, there are several well-established exceptions to this rule, and such evidence may be admitted if it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial. *Id.*; *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). "'An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged. This evidence is admissible to present a complete and coherent picture of the events that transpired.'" *State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc 1998) (quoting *Harris,* 870 S.W.2d at 810) (internal citations omitted).

"The list of exceptions to the general rule is not exclusive but, in each instance, announce a judicial conclusion that the prior-bad-acts evidence is both

logically and legally relevant." *State v. Roberts,* 948 S.W.2d 577, 591 (Mo. banc 1997). Evidence is logically relevant if it tends to establish defendant's guilt; it is legally relevant when its probative value outweighs its prejudicial effect. *Colvin,* 312 S.W.3d at 439. "'The balancing of the effect and value of evidence rests within the sound discretion of the trial court.'" *Id.* (quoting *State v. Smith,* 292 S.W.3d 595, 599–600 (Mo.App. S.D.2009)).

▮ Here, we find the trial court did not abuse its discretion in admitting evidence that Appellant placed methamphetamine residue on T.M.'s tongue the morning of his death. A part of the defense was Appellant accidentally caused T.M.'s injuries resulting in his death, as opposed to intentional conduct on Appellant's part. The evidence was part of the sequence of events leading up to T.M.'s death and necessary to present a complete and coherent picture of the crimes charged. Appellant explained to investigators he had placed methamphetamine residue on T.M.'s tongue the same morning he continually struck T.M.'s head. Appellant's intentional conduct toward T.M. after picking T.M. up and taking T.M. into his sole custody is probative of Appellant's increasing frustrations in attempting to care for T.M. The events which occurred the morning of T.M.'s death, including any abusive conduct toward T.M., provide important context for a jury to understand Appellant's subsequent abuse that caused T.M.'s fatal injuries.

▮ The State is also correct that this evidence is admissible because it tends to show T.M.'s injuries were not the result of an accident.[7] Evidence of prior bad acts may also be admissible when the defendant claims that the victim's injuries were the result of an accident. *State v. Candela,* 929 S.W.2d 852, 871 (Mo.App. E.D. 1996). In this case, Appellant claimed that T.M.'s injuries were the result of an accident and that he never intended to harm T.M.[8] Because Appellant's intent was at issue, evidence of Appellant's purposeful mistreatment of T.M. earlier that morning was admissible to support the State's position that Appellant knowingly inflicted T.M.'s injuries. *See State v. Franklin,* 854 S.W.2d 55, 58 (Mo.App. W.D.1993) (holding that evidence of a child's malnourishment was probative of defendant's feelings for the child, was relevant as proof of defendant's general animosity toward him, and supported the inference that defendant intended to cause him serious physical injury when the child's death was caused by a blunt impact to the abdomen). Similarly, placing residue of an illegal drug on T.M.'s tongue was potentially harmful to the infant's well-being. It was probative of the Appellant's feelings for T.M. and his intentional disregard for T.M.'s well-being, and supported the inference that Appellant intended to cause him serious physical injury. Appellant's abuse of T.M. falls under a well-established exception to the prohibition of evidence of prior bad acts as it tends to establish Appellant's intent to harm T.M. and the absence of an accident in T.M.'s death.

▮ Finally, the evidence was not so prejudicial as to require reversal. It is unlikely this evidence influenced the jurors

---

7. It is of no consequence that the trial court held it admissible on other grounds as a trial court's ruling on the admissibility of evidence will be upheld if it is sustainable on any theory. *State v. McLaughlin,* 272 S.W.3d 506, 509 (Mo.App. E.D.2008).

8. Appellant's attorney argued that "even if you believe the statement that [Appellant] shoved in baby's head, pushed that baby's head, that baby's head against a hard object, the board on the couch, that that was not an intentional act on [Appellant's] part to harm the baby."

to create a reasonable probability that the jury would have acquitted but for its admission as overwhelming evidence of Appellant's guilt was adduced during trial. That evidence is recounted in the analysis of Appellant's first two points in this opinion and need not be recounted here.

Therefore, there is no showing the trial court's ruling was clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. We find the trial court did not abuse its discretion in overruling Appellant's objection to this evidence. Accordingly, Appellant's Point III is denied.

The judgment and sentence of the trial court is affirmed.

SCOTT, C.J., and BATES, J., Concur.