

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| AUNDRA WOODS, | ) |
| | ) |
| Respondent, | ) |
| | ) WD76297 |
| v. | ) |
| | ) OPINION FILED: |
| | ) December 9, 2014 |
| STATE OF MISSOURI, | ) |
| | ) |
| Appellant. | ) |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Justine E. Del Muro, Judge

**Before Division II:** Victor C. Howard, Presiding Judge,
Alok Ahuja, Chief Judge, and Mark D. Pfeiffer, Judge

The State appeals from the motion court's grant of Aundra Woods's ("Woods")

Rule 29.15[1] motion based on ineffective assistance of counsel. We reverse.

### Factual and Procedural History[2]

On February 22, 2009, female victim G.C.[3] went to Woods's house located at 4620

Kensington in Jackson County, Missouri. Woods and G.C. were friends who often smoked crack

---

[1] All rule references are to Missouri Court Rules (2014).

[2] On appeal from the motion court's ruling on a Rule 29.15 motion, we view the facts in the light most favorable to the verdict. *Radmer v. State*, 362 S.W.3d 52, 53 n.1 (Mo. App. W.D. 2012). Portions of the factual section herein are adopted from Woods's direct appeal without further reference. *State v. Woods*, 357 S.W.3d 249 (Mo. App. W.D. 2012).

together. On this evening, G.C. arrived around 6 p.m. and watched television with Woods while Woods drank alcohol. They were both seated on Woods's bed when Woods jumped up and stabbed G.C. in the hip with a knife. Woods then attempted to stab G.C. in the chest, but she was able to grab the knife out of his hand and throw it across the room, cutting her hand in the process.

Woods then wielded another knife and told G.C. that since he had already stabbed her, he might as well finish her off. G.C. then made attempts to calm him down. Woods told G.C. to take her clothes off. He then bandaged G.C.'s stab wound with duct tape and at her request took her to use the restroom. While G.C. was using the restroom, Woods stood by the door, with the knife, and told her she was not going anywhere.

After using the restroom, Woods and G.C. returned to the bedroom where Woods held a knife to G.C.'s throat and told her to perform oral sex on him. Fearing for her life, G.C. complied. With the knife still pointed at G.C.'s neck, Woods then tried to insert his penis into G.C.'s vagina but was unable to maintain an erection.

After several hours, G.C. requested that she be fed, and at Woods's direction, she went to the kitchen to put a biscuit in the microwave. At this point, she escaped through the back door and knocked on several of the neighbors' doors seeking help. The Kansas City, Missouri, police responded to a call and located G.C., only partially clothed (with no clothing from the waist down other than socks), in the middle of the street at approximately 3:30 a.m. on February 23, 2009.

G.C. was taken by ambulance to St. Luke's Hospital where she required seven or eight staples to close her stab wound and several stitches to treat the cut on her finger. She described

---

[3] Because there was evidence of a sexual violation, we use the victim's initials pursuant to section 566.226. All statutory references are to RSMo 2000 as currently supplemented unless indicated otherwise.

the assault to police. She then had a Sexual Assault Nurse Examiner ("SANE") perform a Sexual Assault Forensic Examination ("SAFE Exam"). The results did not show any evidence of Woods's DNA or pubic hairs.

Woods was arrested on the afternoon of February 23, 2009, at a local motel. Buccal and penile swabs were collected from him. After a Rapid Stain Identification ("RSID") test, the penile swab presumptively indicated the presence of saliva, breast milk, or fecal matter. Later, a DNA analysis was done on the penile swab, which did not show any DNA from G.C. Similar presumptive testing was performed relating to blood and semen.

After a jury trial, Woods was acquitted on the charge of forcible rape but convicted and sentenced on the remaining two counts: forcible sodomy and assault in the second degree.

We affirmed Woods's conviction. *State v. Woods*, 357 S.W.3d 249 (Mo. App. W.D. 2012). One issue on direct appeal was whether the trial court plainly erred in admitting evidence related to the RSID test for saliva. Woods argued that because the RSID test is only presumptive, the State's argument implying the presence of G.C.'s saliva on the penile swab was improper. But because Woods had affirmatively withdrawn any objection to the admission of the RSID test results, he had waived appellate review. *Id.* at 255. A second issue on direct appeal was whether the trial court plainly erred in excluding evidence, as a discovery sanction, from an investigator working on Woods's behalf. *Id.* at 252. But because Woods had not made an offer of proof, Woods had not adequately preserved the matter. *Id.* at 254. Our *ex gratia* review, however, yielded no error in the exclusion of the investigator's testimony. *Id.*

Woods then filed a Rule 29.15 motion, arguing, *inter alia*, that his trial counsel was ineffective for failing to object to the admission of the RSID test results at trial and for failing to take steps necessary for the admission of the investigator's testimony. After an evidentiary

hearing, the motion court found that Woods's trial counsel was ineffective on two grounds: (1) for consenting to the introduction of the RSID test results and for failing to object to the State's improper characterization of the results of this test in closing argument; and (2) for failing to comply with Rule 25.05 by not turning over notes from an investigator at the public defender's office resulting in the trial court's refusal to allow the investigator to testify, and for failing to make an offer of proof as to the investigator's testimony so as not to preserve the issue on direct appeal.

The State appeals. Further facts are set forth as necessary.

### Standard of Review

As the movant, *Woods*[4] had the burden of proving his claims for relief by a preponderance of the evidence. Rule 29.15(i). The standard for proving ineffective assistance of counsel is high. *Middleton v. State*, 80 S.W.3d 799, 808 (Mo. banc 2002). Appellate review of a motion court's denial of a Rule 29.15 motion for post-conviction relief is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(k). "The motion court's decision will be considered clearly erroneous if a full review of the record leaves the appellate court with a full and definite impression that a mistake has been made." *Franklin v. State*, 24 S.W.3d 686, 689 (Mo. banc 2000).

To establish ineffective assistance of counsel warranting post-conviction relief, the movant must satisfy the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the movant must show that counsel's performance was deficient by falling below an objective standard of reasonableness. *Id*. at 688. If counsel's performance was deficient, the

---

[4] As we explain in our ruling today, part of the clear error of the judgment is its failure to adhere to the evidentiary dictates of Rule 29.15(i). As we explain more fully in the analysis of the two points on appeal, the judgment erroneously convicted *the State* for its failure to produce evidence at the Rule 29.15 evidentiary hearing to contradict Woods's claims for relief, effectively reversing the burden of proof required by Rule 29.15(i).

4

movant must then prove that he was prejudiced by counsel's deficiency. *Id*. at 687. Prejudice occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id*.

There is a strong presumption that counsel's conduct was reasonable and effective. *Id*. at 689. To overcome this presumption, the movant must point to specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of effective assistance. *Id*. at 690. Strategic choices made after a thorough investigation of the law and the facts are virtually unchallengeable. *Id*.

## I.

By way of background, the State's first point on appeal concerns pre-trial and trial proceedings surrounding the RSID test results, presumptively showing the presence of alpha-amylase, a component of saliva.[5] Woods's trial counsel moved in limine to exclude admission of the presumptive testing for saliva. Trial counsel's motion in limine also sought to exclude any evidence of similar presumptive test results for semen and blood. The trial court preliminarily sustained the motion but noted to the State that "if you show me some case law that says presumptive tests alone is [sic] sufficient evidence to bring that issue forward I'll permit it." Before evidence was presented, the State argued that presumptive tests are admissible pursuant to the guidelines established by the Missouri Supreme Court in *State v. Taylor*, 298 S.W.3d 482 (Mo. banc 2009). After being presented with this precedent, Woods's trial counsel conceded the

---

[5] *See State v. Blair*, 298 S.W.3d 38, 48 (Mo. App. W.D. 2009) (amylase test for the presence of saliva admitted into evidence).

admissibility of the presumptive testing as to saliva and semen. The trial court ruled that "since [defense counsel] is not opposed to that, I think the saliva will come in and the rest do not."[6]

At trial, Patrick Jones ("Jones"), a criminologist with the Kansas City Police Department's crime laboratory, testified that he performed a "presumptive test" on the penile swab that indicated the possible presence of saliva. Jones stressed that the saliva test was presumptive only:

> A.     That item was tested for the presence of saliva. I used a presumptive test to determine whether or not saliva could be present.
>
> Q.     What was the result of that test?
>
> A.     Saliva was indicated based upon the use of presumptive tests. And if I may clarify?
>
> Q.     Please do.
>
> A.     A presumptive test is not an identification test. It's a test that merely indicates the presence of a substance.[7] So once again in this case I used a presumptive test for the presence of saliva. It does not without a doubt specify and indicate or identify the presence of saliva. However, so far in the cases of

---

[6] Notably, the trial court and motion court are one and the same judge. And, upon being presented with the *State v. Taylor* precedent, the *trial* court did not simply admit all evidence consented to by Woods's trial counsel; instead, the *trial* court, after being presented with the *Taylor* precedent, permitted the saliva presumptive test results but *not* other presumptive test results evidence to which Woods's trial counsel had consented. However, as we note in our recitation of the *motion* court's judgment, the *motion* court found Woods's trial counsel ineffective for relying upon the *Taylor* precedent in precisely the same fashion that the *trial* court presumably did in admitting the saliva evidence in the first place. Effectively, this results in the *motion* court interpreting the *Taylor* precedent differently than the *trial* court did—where the judge in both instances was the same person—hardly the sort of procedural circumstance that leads one to believe that this was an easy evidentiary call for any of the participants at trial. Instead, Woods's trial counsel was faced with "strategic choices made after a thorough investigation of the law and the facts" which are "virtually unchallengeable." *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)).

[7] This testimony is consistent with the definition of "presumptive testing":

> Once evidence items are selected for further processing, presumptive tests may be conducted to determine if biological fluids of interest are present. Several tests exist to screen for blood, semen, saliva, and fecal matter, as well as tests that determine if certain biological fluids are of human origin. Some of these tests are presumptive, meaning that a positive result reveals the presence of a substance found in the fluid of interest.

JUSTICE MING W. CHIN ET AL., FORENSIC DNA EVIDENCE: SCIENCE AND THE LAW, § 3:3 (2014), *available at* Westlaw TRG-DNA.

6

blood the test I've talked about have been confirmatory tests. Those tests have identified blood without a doubt on those items.

Jones explained that substances other than saliva, such as breast milk and fecal matter, may react to this test. On cross-examination, Woods's attorney elicited again from Jones the presumptive nature of the test and that it is not used for conclusive identification of saliva.

Jarrah Myers ("Myers"), a DNA analyst with the Kansas City police crime laboratory, testified about her examination of the swab and other evidence. Myers testified that she found Woods's DNA on the penile swab but not G.C.'s. Defense counsel elicited from Myers that she "was not able to detect any foreign information from Aundra Woods['s] penile swab" and that the *only* DNA found on that swab belonged to Woods. However, Myers also testified that contact DNA, such as saliva, can be removed rather easily "on any type of surface that would be regularly handled or rubbing off on clothing or washing[;] any of those circumstances would remove any type of foreign DNA that is present." Myers indicated that this can take place within a matter of hours "unless [the tested surface has] been perfectly undisturbed."[8]

The saliva issue arose again during closing argument. The State argued that Woods forced G.C. "to put her mouth on his penis." The State also argued that the test "presumptively showed saliva on the penile swab of the defendant" and "[t]hat backs [G.C.] up."

Conversely, Woods's trial counsel argued that G.C.'s "DNA is nowhere to be found on Aundra Woods's penile swab." She further argued the following:

> [W]e all shed DNA all the time, whatever we touch we can shed DNA on it. . . . Common sense tells you that the longer that you have contact with something, the greater the friction, the more likely you are to shed DNA and the more likely that DNA is transferred to another object or another thing. There is no DNA evidence to support that a sexual assault took place. It doesn't add up.

---

[8] Of relevance here, Woods's permanent residence was his *house*; but he was found and arrested at a local *motel room* hours after the incident, leading the State to argue, without objection at trial or in the present Rule 29.15 motion, that Woods had "cleaned up in that hotel room."

Defense counsel also argued that "Even Jarrah Myers and Patrick Jones, the analysts at the crime lab, same thing, they don't know, they can't tell you what happened or who did it or what actually happened that night." And later: "There is no DNA evidence to back [G.C.'s story] up. There is no physical evidence to back it up. All you are left with is [G.C.'s] word and it doesn't add up."[9]

The motion court's judgment wherein Woods's Rule 29.15 motion is granted on this issue states, in pertinent part:

> Trial counsel had properly moved in limine, to exclude the admission of a presumptive test for saliva, the [RSID] test, to which the court granted, finding that the prejudicial effect of the evidence outweighed its probative value. Later and before evidence was presented, trial counsel withdrew her motion on behalf of the movant, having no objection to the admission of the presumptive test. Trial counsel relied on the case of *State v. Taylor*, 298 S.W.3d 482 (Mo. banc 2009), which upon close review, is distinguishable from the case before this court. In *Taylor*, the Missouri Supreme Court found no error in the admission of the presumptive phenolphthalein test because a *Frye*[10] hearing had been conducted prior to its admission, the nature and limitations of the test had been accurately described to the jury and that a further DNA test was performed, the results of which were consistent with the presumptive test.
>
> In this case, no such measures were taken. This case is closer factually to the case in *State v. Daniels*, 179 S.W.3d 273 (Mo. App. W.D. 2005) where the Court of Appeals reversed the conviction based on the admission of [presumptive] testing without a *Frye* hearing and the state's improper argument that the tests were proof[11] of the presence of human blood. *Id.* at 285.
>
> . . . .

---

[9] The effect of these arguments is to submit to the jury that the State presented not just one but multiple crime scene investigators, and no witness could point to any physical evidence or any physical test results that put Woods and G.C. together. As these comments suggest, Woods's trial counsel seized upon the "presumptive" but not "conclusive" saliva evidence of the State to point out that the State had at its disposal what it needed to make the DNA link and it failed to do so. This is hardly ineffective closing argument, particularly when we are reminded that Woods's allegedly "ineffective" trial counsel was "effective" in obtaining an acquittal on one of the charges against Woods.

[10] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[11] Conspicuously absent from the judgment is the word "conclusive." As we explain later in our ruling today, it was the State's argument in *Daniels* that the presumptive testing constituted "*conclusive* proof" of the presence of human blood that was significant to our ruling in *State v. Daniels*, 179 S.W.3d 273 (Mo. App. W.D. 2005).

8

Not objecting to the admission of the presumptive test and not objecting to the use of presumptive test results in closing argument to corroborate the credibility of the victim where the defense was premised primarily on discrediting the victim's version of events, rises to the level of ineffective assistance of counsel.

In its first point on appeal, the State argues that the motion court clearly erred in its interpretation of the law and has, accordingly, wrongfully convicted Woods's trial counsel of failing to make non-meritorious objections or objections contrary to the trial strategy that was reasonably—and effectively—employed by trial counsel in closing argument. We agree.

### *What This Point Is Not About: A Frye Hearing*

Woods argued to the motion court that a significant aspect as to trial counsel's ineffectiveness was trial counsel's failure to demand a *Frye* hearing as to the scientific reliability of RSID testing for any purpose. Woods argued to the motion court that he is left only with the unscientifically challenged testimony of crime lab criminologist Jones, and it is unknown whether the nature and limitations of the RSID test were accurately described to the jury.[12] Clearly, the motion court agreed with Woods and found it significant to its judgment that the "protective measure" of a *Frye* hearing was not conducted. However, the judgment neglects to mention that, there was *no evidence presented at the Rule 29.15 evidentiary hearing* as to what the scientific evidence *would have demonstrated* had there been a *Frye* hearing.

The only witnesses that Woods presented at the Rule 29.15 evidentiary hearing were his two trial attorneys, an investigator from the public defender's office, and Woods. None of these witnesses testified as to the scientific unreliability of the RSID test and no other evidence was offered for that purpose at the hearing. Absent such evidence, which Woods bore the burden of

---

[12] Any complaint regarding what evidence was actually presented about the usefulness and limitations of the RSID test at Woods's trial is an evidentiary claim that was apparent at trial. Hence, Woods was required to raise that issue in his direct appeal and he cannot use Rule 29.15 to seek review of matters that should have been raised on direct appeal. *See Melillo v. State*, 380 S.W.3d 617, 621 (Mo. App. S.D. 2012) ("If a claim was apparent at trial, then it is an issue for direct appeal, not a Rule 29.15 proceeding. Rule 29.15 cannot be used to review matters which were or should have been raised on direct appeal.") (citations omitted) (internal quotation marks omitted).

9

presenting at the Rule 29.15 evidentiary hearing, Woods was not entitled to rely upon such claim of trial counsel ineffectiveness, because he failed to come forward with any evidence of prejudice. "Allegations in a post-conviction motion are not self-proving." *Stevens v. State*, 353 S.W.3d 425, 431 (Mo. App. S.D. 2011) (internal quotation omitted). In response to failing to present evidence of how the movant was prejudiced by his trial counsel's alleged ineffectiveness, the court in *Weekley v. State*, 265 S.W.3d 319, 323 (Mo. App. S.D. 2008), stated: "Mere conclusory speculations of prejudice by Movant are not considered substantive evidence of counsel's ineffectiveness." Finally, in *Borst v. State*, we reversed a motion court's grant of a Rule 29.15 motion claiming ineffective assistance of counsel, in part, because the conclusory allegations by movant as to the contents of medical and school records that allegedly would have led to a different result at trial were not presented as evidence at the Rule 29.15 evidentiary hearing; as such, we concluded that the movant had failed to meet his burden of proving prejudice required by the prejudice prong of the *Strickland* test. 337 S.W.3d 95, 102-03 (Mo. App. W.D. 2011).

Similarly, here, trial counsel's failure to request a *Frye* hearing could not serve as a basis to grant post-conviction relief where no evidence of what such a *Frye* hearing would have produced was offered at the Rule 29.15 evidentiary hearing. Plainly, the lack of a *Frye* hearing request at trial is a red herring unsupported by any evidence of prejudice sufficient to meet the prejudice prong of the *Strickland* test.

<em>What This Point <u>Is</u> About: State v. Taylor</em>

Understanding that the lack of a *Frye* hearing is irrelevant, we turn to the two key cases concerning admissibility of presumptive testing on which Woods relies: *State v. Taylor*, 298 S.W.3d 482 (Mo. banc 2009), and *State v. Daniels*, 179 S.W.3d 273 (Mo. App. W.D. 2005).

In Missouri, our Supreme Court has announced the rule for the admissibility of presumptive testing, even in the absence of confirmatory testing. In *Taylor*, a phenolphthalein test, which is a presumptive test used to determine the possible presence of blood, was at issue, and the Supreme Court concluded:

> Scientific tests do not have to be conclusive to be admissible. Although some states require that the test be conclusive, other states have held that presumptive blood tests are admissible as long as the test is accurately described so it is helpful to the jury. *If the jury is fully informed, the fact that the test may react positively to substances other than blood affects the weight given to the evidence, not its admissibility.*

*Taylor*, 298 S.W.3d at 500 (emphasis added) (citations omitted). The *Taylor* court held that the presumptive test results were relevant and admissible because the scientific testimony at trial accurately described the evidentiary limitations of presumptive testing, describing such test results as reflecting the "possible" not "conclusive" presence of blood. *Id.* at 501.

Conversely, in *Daniels*, we reversed a conviction after the State improperly argued to the jury that luminol (*i.e.*, presumptive) testing was *conclusive* proof of the presence of blood, where (1) the defendant had requested a *Frye* hearing (as to the issue of the conclusiveness of luminol testing) that was refused by the trial court; (2) the State failed to introduce scientific test results to corroborate its argument that luminol tests constituted conclusive test results for the presence of blood; (3) and the State failed to produce any other evidence that would have otherwise corroborated the State's argument that it had conclusively proven the presence of blood (in defendant's house and car). *Daniels*, 179 S.W.3d at 284-85. In *Taylor*, the Supreme Court described the *Daniels* holding as follows: "*Daniels* found that the trial court erred in permitting evidence of positive luminol test results as *conclusive* proof of the presence of blood in the defendant's car and house without conducting a *Frye* hearing to determine if such tests are conclusive." *Taylor*, 298 S.W.3d at 501 (emphasis added).

11

Here, perhaps because the State agreed that it was not permitted to argue that RSID presumptive testing was conclusive proof of saliva on the relevant penile swab (nor did the State ever argue that it was conclusive), Woods's trial counsel—who was familiar with RSID presumptive testing from other cases—did not request a *Frye* hearing. Thus, unlike *Daniels*: (1) the State did not offer proof of presumptive testing for saliva as *conclusive* proof of the presence of saliva; (2) the State presented voluminous evidence about presumptive RSID testing and its limitation to only demonstrating the possible presence of saliva (as well as other possible contributing substances) and expressly limited its argument to the jury accordingly; and (3) a *Frye* hearing was never requested by Woods at trial to challenge the scientific reliability of RSID test results for the limited nature in which those results were offered by the State. Plainly, *Daniels* has limited applicability to the circumstances of this case.

Nor would *Taylor* have provided the basis for a meritorious objection. Because no *Frye* hearing was conducted—unlike *Taylor*—there was no way of knowing whether the State's witnesses at trial had accurately described the limitations of the RSID test and had not otherwise produced evidence confirming the results of the presumptive RSID test. As we have previously detailed in our ruling today, it is *not* the State's burden to prove (at the Rule 29.15 evidentiary hearing) that *Frye* hearing evidence would have corroborated its presentation of RSID presumptive testing; rather, it is movant's (*i.e.*, Woods's) burden of proving that the *Frye* hearing evidence would *not* have corroborated the State's RSID testing presentation of evidence. Woods has not done so and cannot now complain of *Frye* hearing error.

Instead, like *Taylor*, the RSID test in Woods's trial was accurately described as a presumptive test, indicating only the possible presence of saliva (as well as other contributing substances). Thus, as in *Taylor*, since "the jury [was] fully informed, the fact that the test may

12

react positively to substances other than [saliva] affects the weight given to the evidence, not its admissibility." *Taylor*, 298 S.W.3d at 500.

Given *Taylor*'s applicability, Woods's trial counsel cannot be convicted of incompetence for failing to raise a non-meritorious objection. "Counsel is not required to make non-meritorious objections, and 'counsel is not ineffective for failing to make non-meritorious objections.'" *Williams v. State*, 205 S.W.3d 300, 305 (Mo. App. W.D. 2006) (quoting *Worthington v. State*, 166 S.W.3d 566, 581 (Mo. banc 2005) (internal citation omitted)). *See also Johnson v. State*, 406 S.W.3d 892, 905 (Mo. banc 2013); *Forrest v. State*, 290 S.W.3d 704, 714 (Mo. banc 2009). Thus, this record leaves us with a full and definite impression that an error has been made.

Furthermore, as detailed above, Woods's trial counsel ably cross-examined all of the State's witnesses and made a compelling argument that utilized the results of the RSID presumptive testing in combination with the DNA test results (which were negative for G.C.'s DNA being found on Woods and negative for Woods's DNA being found on G.C.). Even were we to assume that a continuing objection at trial to the RSID test results or any mention of those results as corroborating G.C.'s testimony would have led the trial court to exclude such evidence or argument and that such ruling would not have been an abuse of discretion, "[t]he selection of witnesses and evidence are matters of trial strategy, virtually unchallengable in an ineffective assistance claim." *Johnson*, 406 S.W.3d at 900 (internal quotation omitted). "No matter how ill-fated it may appear in hindsight, a reasonable choice of trial strategy cannot serve as a basis for a claim of ineffective assistance of counsel." *Id.* "In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes." *State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996). "It is feared that frequent objections irritate the

jury and highlight the statements complained of, resulting in more harm than good." *Id.*

Specifically, as to closing argument:

> Trial counsel is granted vast latitude and judgment about whether or when to make objections. Merely because a trial counsel failed to object to everything objectionable, does not equate to incompetence. In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes. As such, the failure to object during closing argument only results in ineffective assistance of counsel if it prejudices the accused and deprives him of a fair trial.

*Greer v. State*, 406 S.W.3d 100, 105 (Mo. App. E.D. 2013) (citations omitted) (internal quotation marks omitted).

> Ineffective assistance of counsel is rarely found in cases where trial counsel has failed to object [to closing argument]. The movant must prove that a failure to object was not strategic and that the failure to object was prejudicial. . . . The failure to object to closing argument constitutes ineffective assistance only when the comment was of such a character [that] it resulted in a substantial deprivation of defendant's right to a fair trial.

*Cornelious v. State*, 351 S.W.3d 36, 44 (Mo. App. W.D. 2011) (citations omitted) (internal quotation marks omitted).

Here, though Woods's trial counsel could not recall at a Rule 29.15 evidentiary hearing some three years after Woods's trial what the trial strategy was for not objecting to the RSID presumptive testing evidence, trial counsel's cross-examination of the State's evidence and closing argument at trial demonstrate a pattern of welcoming all of the State's purported "junk science" evidence so that it could be demonstrated to the jury time and time again that *none* of the physical evidence or any testing thereof linked Woods's DNA to G.C. This trial strategy was not only reasonable, it was also effective in leading to Woods's *acquittal* on the charge of forcible rape. And, as to those charges that Woods was convicted of, there was ample evidence of Woods's guilt, including G.C.'s expansive, descriptive testimony of Woods's actions with regard to forced oral sex at knifepoint; G.C.'s half-naked and lacerated appearance when police

14

picked her up in the middle of the night; and, G.C.'s "flat affect" to the nurse that performed the SAFE exam, a characteristic that the nurse indicated was not an unusual response for rape victims.

Woods failed to satisfy either the performance prong or the prejudice prong of the *Strickland* test, and he failed to establish his right to post-conviction relief based on trial counsel's failure to object to the admission of the RSID testing. The motion court clearly erred in concluding otherwise. Accordingly, the State's first point on appeal is granted.

**II.**

In its second point, the State contests the motion court's ruling that defense counsel was ineffective concerning the excluded testimony of Winnie Jamison ("Jamison"), a criminal investigator with the public defender's office. The facts giving rise to the State's second point begin with defense counsel's opening statement, in which she discussed G.C.'s various and inconsistent statements with Officer David Roberts ("Officer Roberts") and Detective Miller ("Detective Miller") and statements during G.C.'s deposition:

> What she doesn't give are details about being raped. It's only after Officer Roberts reminds [G.C.] that she told him she had been raped that she fits her story of being raped in the time line of events that she has already described for Officer Roberts. [G.C.] gives three more statements regarding the events of February 22nd, February 23rd, 2009. She talks with Detective Miller, gives a formal statement. She talks with Winnie Jamison on the phone. And she comes in for a deposition in which a court reporter, the prosecutors and I are present.
>
> You will hear about each of these statements and the inconsistencies between them.

After defense counsel's opening statement but prior to calling the first witness, the State approached the bench and stated that although Jamison was an endorsed witness, her testimony was to involve photographs and "then also the fact that she was present for interviews of witnesses and those sorts of things. I have received no information about a statement that my

victim made to Winnie [Jamison] over the phone." The State argued, *inter alia*, that the defense had not complied with Rule 25.05(a)(2) because the defense had not turned over notes or other documentation from the telephone conversation. The trial court ruled in favor of the State, and Jamison did not testify.

At trial, defense counsel cross-examined G.C. extensively about statements she made to Officer Roberts and Detective Miller, and also about G.C.'s deposition statements. Defense counsel pointed out that G.C. gave a lot more detail during the deposition about the specific conversation she had with Woods than she did during her interviews with police. Defense counsel also pointed out that the details were different in the various statements that G.C. gave.

During closing argument, one of defense counsel's themes centered around G.C.'s story, which counsel argued "doesn't add up." She argued that when Officer Roberts arrived on the scene, G.C. made no mention of the vaginal and oral sex. Woods's counsel pointed out that G.C. did not initially mention the rape: "I submit to you that any woman who has been raped for hours, that is going to be the first thing you are thinking about, that is going to be the first thing that someone says. It's not going to be an after thought." Defense counsel pointed out that G.C. forgot to mention the rape "not once but twice." Defense counsel argued:

> [G.C.] wants you to believe that she actually remembers more now about what happened that night than she did about a year ago when it happened. Her story changes with different tellings. One time he pulls down her pants, the next time he's standing in the doorway of the bathroom with his hand on the doorjamb. One time he walks toward the kitchen when she's in there getting that Egg McMuffin, other times he's still in the bedroom, never came out. One time she tells you he threatens her with kerosene, the other time she doesn't say anything about the kerosene. And there are other inconsistencies as well.

> But her stories actually become more detailed as far as the dialogue goes, it becomes more fantastic as time has gone on. She wants you to believe that when she thinks she is going to die what she does is says hey, if you are going to kill me, you've got to feed me first. That he stabs her out of nowhere, rapes her, threatens to kill her, and tells her so in many various different phrases that you

16

heard, and then he's like oh, you are hungry, yeah, sure, there is an Egg McMuffin in the microwave, go heat it up. He knows where his back door is. Her story defies logic and it doesn't add up.

During the evidentiary hearing on Woods's Rule 29.15 motion, roughly three years after the trial, defense counsel testified that she was going to use Jamison as a rebuttal witness depending on G.C.'s testimony. Defense counsel remembered deposing G.C. She remembered that Jamison "had spoken with [G.C.], and that some of her statements were different than other statements that we had in discovery." She testified that it was "possibly [her] intention to impeach [G.C.] from statements she had made to Miss Jamison." Defense counsel also testified that she had not believed she needed to turn over Jamison's notes to the State if she were calling Jamison as a rebuttal witness and that it was not trial strategy not to disclose the notes.

Defense counsel also stated, however, that she cross-examined G.C. at trial and that she "was able to elicit essentially the same information from her." Defense counsel further testified:

> Q.     Do you believe that there was information that Miss Jamison would have been able to represent that would have been different or helpful to the case?
>
> A.     I don't believe that there was anything that was different because as I recall [G.C.], when she testified, admitted that she had made inconsistent statements. She didn't fight me on that, so I mean, I believe that the information that was elicited through [G.C.] wasn't different necessarily than what would have been elicited through Miss Jamison.

Defense counsel additionally testified that she did not attempt to make an offer of proof concerning what Jamison's testimony would have been and that there was no trial strategy in not making an offer of proof.

At the Rule 29.15 evidentiary hearing, Woods called Jamison as a witness. Jamison testified that she remembered reviewing G.C.'s statements before speaking with her. Jamison

17

took notes about that conversation. Consistent with defense counsel's testimony, Jamison testified in part:

> Q. Do you recall in your conversation with [G.C.] whether she would have provided perhaps conflicting information than you had received from other statements that you had been given?
>
> A. Yes.
>
> Q. Were you prepared to testify as to that conflicting information?
>
> A. Yes, I was.

Woods, however, never elicited from Jamison *what the conflicting information would have been*.[13]

The judgment on this point states:

> Although trial counsel states at the evidentiary hearing that her intent was to call Ms. Jamison as a rebuttal witness, no such representation was made to the court at the trial, as shown [in the excerpts from defense counsel's testimony at the evidentiary hearing]. Her opening statements certainly suggested calling Ms. Jamison in Movant's case in chief. Further[,] trial counsel admitted at the evidentiary hearing that there was no trial strategy for failing to make an offer of proof. The court determined that trial counsel did not provide the statement to the state and violated Rule 25.05(A)(1) [sic].
>
> When the defense is prohibited from calling a witness who would contrdict [sic] the testimony of the State's key witness, it is incumbent upon the defense to make an offer of proof. An offer of proof allows trial counsel one last opportunity to convince the trial court to reverse the ruling and if the ruling is not reversed, to properly preserve the issue for direct appeal. Making an offer of proof was critical in this case, especially when the testimony being excluded would directly contradict the complaining witness's testimony. The only method for reversing the court's ruling is for trial counsel to make an offer of proof to demonstrate to the court that the probative value of the evidence outweighs any prejudicial effect

---

[13] Instead, Woods appears to believe he is entitled to a *presumption* of prejudice. Woods improperly relies upon a *direct appeal* case relating to the *erroneous* exclusion of evidence and a corresponding presumption of prejudice. *State v. Bashe*, 657 S.W.2d 321, 325 (Mo. App. S.D. 1983). Here, first, we previously have ruled that the evidence that was excluded at trial was not erroneously excluded. *State v. Woods*, 357 S.W.3d 249, 254 (Mo. App. W.D. 2012). Further, the current appeal is not a direct appeal from a conviction in which *the State* bore the burden of proof. Instead, we are reviewing a post-conviction claim of ineffective assistance of counsel in which the burden of proof has been shifted to *the movant*. And, that burden of proving prejudice is satisfied by the movant demonstrating prejudice by a *preponderance* of the evidence, not a *presumption* of the evidence. *See* Rule 29.15(i); *Neal v. State*, 379 S.W.3d 209, 215-16 (Mo. App. W.D. 2012).

to the state. Trial counsel failed to take this very fundamental and crucial step. Further, no attempt was made by trial counsel to allow the state to review the contents of the statement, or to offer the state the opportunity to interview Ms. Jamison in advance of her testimony, as was encouraged by the court.

At the evidentiary hearing, trial counsel claimed, despite her inability to recall facts in this case, that she cross-examined the witness on her statements that were made to Ms. Jamison, but provided no detailed factual information. Without factual details from trial counsel at the evidentiary hearing and without the benefit of an offer of proof[,] the court cannot determine that what Ms. Jamison would have testified to, was in fact addressed on cross-examination. A review of the cross-examination of the complaining witness, [sic] does not aid the court in determining the content of Ms. Jamison's report.

Further, at the evidentiary hearing, although Ms. Jamison was called to testify, she was only asked if she obtained a statement from the complaining witness and asked whether it contained conflicting information. At no time, during these proceedings was Ms. Jamison provided with a copy of the statement and she gave no factual testimony about its contents. Ms. Jamison did testify that she believed she was at the courthouse during trial and available to be called to make the offer of proof during the trial.

In order to, "determine whether the exclusion resulted in prejudice to the [movant], the facts and circumstances of the particular case must be examined including the nature of the charge, the evidence presented and the role the excluded evidence would have played in the defense's theory." *State v. Martin*, 103 S.W.3d 255, 261 (Mo. App. W.D. 2003). No one disputes that Ms. Jamison's testimony and the statements she had taken, would contradict the State's key witness.

Movant was charged with Rape, Second Degree Assault and Forcible Sodomy. Movant was acquitted on the Rape, the complaining witness was cross-examined regarding her numerous and varied statements to police and in her deposition. The excluded testimony would have added yet another witness before the jury to hear about additional contradictory statements made by the complaining witness, further discrediting her testimony. The offer of proof may have provided the court additional information to determine whether the probative value of the testimony outweighed the prejudicial effect on the state and the failure to make an offer of proof, [sic] denied Movant the opportunity to preserve the error for direct appeal.[14] Given the facts of this case, resulting in an acquittal as to the rape charge along with the undisputed fact that Ms. Jamison's testimony would further discredit the state's key witness, the Court finds the outcome both at trial and on direct appeal may have been different and therefore Movant was prejudiced.

---

[14] Though it is not necessary to our ruling today, we also note that, "[a]s a general rule, post-conviction claims based on counsel's failure to adequately preserve issues for appeal are not cognizable under Rule 29.15." *McCoy v. State*, 431 S.W.3d 517, 522-23 (Mo. App. E.D. 2014).

> For the reasons stated herein, the court finds that trial counsel was ineffective for failing to comply with Rule 25.05(A)(1) [sic], for failing to make an offer of proof and for failing to preserve this issue for appeal.

(Citations to the evidentiary hearing transcript omitted.)

The State argues that the motion court erred in finding that defense counsel was ineffective for failing to inform the trial court that she anticipated calling Jamison as a rebuttal witness to impeach G.C. and for failing to make an offer of proof because the excluded evidence was cumulative in nature and because the motion court placed the burdens of production and persuasion on the State. We agree.

"The failure to impeach a witness will not constitute ineffective assistance of counsel unless such action would have provided a viable defense or changed the outcome of the trial." *Thompson v. State*, 437 S.W.3d 253, 263 (Mo. App. W.D. 2014) (citing *State v. Ferguson*, 20 S.W.3d 485, 506 (Mo. banc 2000)). Additionally, "counsel will not be found ineffective for failing to present cumulative impeachment evidence." *Coday v. State*, 179 S.W.3d 343, 352 (Mo. App. S.D. 2005).

We fail to see from the record how Jamison's testimony would have provided a viable defense, changed the outcome of the trial, or resulted in reversal on direct appeal had there been an offer of proof. At best, the record indicates that Jamison's testimony would have been cumulative impeachment evidence to G.C.'s testimony, which belied some inconsistencies in her account of her encounter with Woods. Defense counsel testified that the information that she elicited through G.C. "wasn't different necessarily than what would have been elicited through Miss Jamison." Woods even called Jamison as a witness at his evidentiary hearing, providing the opportunity to elucidate the details of any additional impeachment evidence. Jamison stated *only* that she was prepared to testify as to "conflicting information." Woods did not even ask

20

Jamison at the evidentiary hearing what her testimony would have been about G.C.'s statements nor were Jamison's notes proffered at the hearing. Even on appeal, Woods concedes that "it is unknown what, specifically, Ms. Jamison would have testified to if called as a witness."[15] Accordingly, not only is the motion court's finding that Jamison would have provided "additional contradictory statements made by the complaining witness" unsupported by the record, but also there is no indication that her testimony would have provided a viable defense or changed the outcome of the trial. *Thompson*, 437 S.W.3d at 263.

Irrespective, it was Woods's burden, not the State's burden, to prove by a preponderance of the evidence that trial counsel was ineffective. The motion court's judgment states that "[w]ithout factual details from trial counsel at the evidentiary hearing and without the benefit of an offer of proof[,] the court cannot determine that what Ms. Jamison would have testified to, was in fact addressed on cross-examination"; and "[Jamison] was only asked if she obtained a statement from the complaining witness and asked whether it contained conflicting information. . . . At no time, [sic] during these proceedings was Ms. Jamison provided with a copy of the statement and she gave no factual testimony about its contents"; and "[t]he offer of proof may have provided the court additional information" that could have resulted in reversal. As noted above, it was *Woods's* burden to establish factual details from trial counsel and from Jamison as to what Jamison's testimony would have been. The lack of evidence concerning the testimony Jamison could have offered at trial cuts against *Woods*, the party bearing the burden of

---

[15] Woods additionally states in the argument portion of his brief that "[d]espite the fact that Ms. Jamison testified in the evidentiary hearing that she took notes of her conversation with the complaining witness where conflicting statements were made, no such notes were able to be located in the trial file." Woods does not provide a citation for this statement in violation of Rule 84.04(e), which requires a party to include "specific page references to the relevant portion of the record on appeal" for all factual assertions in the argument portion of the brief. Our reading of Jamison's testimony at the evidentiary hearing does not indicate that the notes could not be located, only that Jamison did not have them at the evidentiary hearing. Regardless, the concession that the impeachment evidence was not presented to the motion court is another indication that Woods simply did not meet his burden of establishing by a preponderance of the evidence that his trial counsel was ineffective.

proof, *not* against the State. The motion court's finding that the content of Jamison's potential trial testimony is unknown establishes that Woods failed to meet his burden of establishing facts that would warrant relief under Rule 29.15.

Given the paucity of developed facts at the evidentiary hearing, we also fail to discern how the proposed impeachment testimony creates a reasonable probability that the trial's outcome would have been different so as to establish prejudice or how an offer of proof could have resulted in a reversal. "'If a prior inconsistent statement by a [S]tate's witness does not give rise to a reasonable doubt as to Movant's guilt, such impeachment evidence is not the basis for a claim of ineffective assistance of counsel.'" *Johnson*, 406 S.W.3d at 904 (quoting *State v. Twenter*, 818 S.W.2d 628, 640 (Mo. banc 1991)). In short, not only did Woods fail to identify or allege any impeachable statement that would have offered him a viable defense to the two counts on which he was convicted, his mere assertion of additional impeachment statements in no fashion gives rise to reasonable doubt of his guilt. *See id.*

Accordingly, Woods failed to satisfy either the performance prong or the prejudice prong of the *Strickland* test on this point and, therefore, established no right to post-conviction relief. The motion court clearly erred in concluding otherwise. The State's second point on appeal is granted.

## Conclusion

The motion court's judgment, which granted Woods's motion for post-conviction relief, is reversed.

_____
Mark D. Pfeiffer, Judge

Victor C. Howard, Presiding Judge, and
Alok Ahuja, Chief Judge, concur.

22