

# In the Missouri Court of Appeals
## Eastern District
### DIVISION TWO

| | | |
|---|---|---|
| TRENTON E. FORSTER, | ) | No. ED112008 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | 21SL-CC02286 |
| | ) | |
| STATE OF MISSOURI, | ) | Honorable Kristine Kerr |
| | ) | |
| Respondent | ) | Filed: October 8, 2024 |

Before Lisa P. Page, P.J., Renée Hardin-Tammons, J., and Rebeca Navarro-McKelvey, J.

Trenton E. Forster (Movant) appeals from the motion court's judgment denying his Rule 29.15[1] motion for post-conviction relief. This court affirmed Movant's convictions of first-degree murder, second-degree assault of a law enforcement officer, and two counts of armed criminal action following a jury trial. *State v. Forster*, 616 S.W.3d 436 (Mo. App. E.D. 2020). He received consecutive sentences of life imprisonment without the possibility of probation or parole, seven years, and ten years each, respectively. We affirm.

### Background

On October 6, 2016, at 5:06 a.m., St. Louis County Police Officers Blake Snyder (Officer Snyder) and John Becker (Officer Becker) responded to a 911 call from a residence on Arno Drive. At trial, Officer Becker testified that he followed Officer Snyder's patrol car into the

---

[1] All references to Rules are to Missouri Supreme Court Rules (2023).

subdivision where Movant was sitting in his car.  Officer Snyder pulled his fully marked patrol vehicle immediately behind Movant's vehicle with his headlights shining directly into Movant's vehicle.  Officer Becker stopped in front of Movant's vehicle and observed Officer Snyder, in uniform, approach and open the driver's side door.  Officer Snyder first said, "hey bud," and then stated "show me your hands" and repeated "police, show me your hands."  He heard his fellow officer's voice escalate in alarm.  Movant then fatally shot Officer Snyder in the face.

Office Becker took cover and ordered Movant to show his hands.  Movant responded, "I have a f---ing gun, kill me."  As Movant kept moving within his car, Officer Becker opened fire on him.  Movant exited his vehicle saying, "F---ing shoot me, I have a gun," and pointed his gun at Officer Becker.  Officer Becker reloaded and fired several more shots at Movant, who dropped his gun and was handcuffed.  In addition to the handgun used to shoot Officer Snyder, police recovered an AK-47, ammunition, and drug paraphernalia from Movant's car.

The State charged Movant with murder in the first degree for the shooting of Officer Snyder, assault of a law enforcement officer in the second degree with respect to Officer Becker, and two counts of armed criminal action.  The case proceeded to trial on January 30, 2019.  Over the course of several days, the State called more than twenty witnesses.  The State adduced evidence of Movant's conduct and mental state leading up to the incident.  Movant obtained a handgun and an AK-47 within five days before the shooting incident.  Movant's social media posts in the months leading up to the incident included statements such as "I want f--- the police carved into my grave[,]" "I feel bad for him, man, I hate the police so much[,]" "Please help me if possible, man, I'll explain why if I have to, but I need Percocet, dude, like I'm legit about to go pull my .9 on a cop or some, I'm losing my f---ing mind, dude," and "I'm not going back to jail,

2

it's like being dead. I'll pull that thing on an officer, I've been thinking about it for a minute – or a min, because I seriously am not getting locked up again."

Over Movant's objection, the State also played an audio recording and submitted a transcript of an excerpt from a June 2017 phone call between Movant and his father. The phone call occurred nine months after the shooting incident while Movant was in jail awaiting trial. During this call, Movant said that his father's "calling the police" on Movant was "some bi--- a--sh--." Movant continued by saying that he did not mean to say his father was "a bi--- . . . but it's just in general. I don't know, I just—it's—f--- the police, you know what I'm saying." Movant's father then talked about how most police are good people doing their job. Movant responded by saying that "most officers in general are people that have been f---ing like bullies most of their life, or have a reason to want to get back at other people."

The mother (Mother) of Movant's friend (Daughter) who lived at the home on Arno Drive testified about the events on the day prior to the incident. Movant and Daughter spent the afternoon "just hanging out" and smoking marijuana in the garage. After taking a video of Movant's obviously impaired condition, Mother told him he "was going to end up in one of two places, prison or he was going to die." Movant responded that he would shoot a cop before he would go to prison. Movant also told Mother that he was "f---ing some dude's b---- and this dude wanted to kill him." Movant left Mother's property that evening, but returned at 5 a.m. Mother was getting ready for work when she heard him arguing with her mother, who also lived there, at the back door of their home. She went outside, yelled at Movant to leave, and said she was calling the police. Movant stepped away but when he returned and began beating on their back door, Mother called the police at 5:03 a.m. She told the dispatcher there was a kid outside and he would not leave. Mother was peeking out of her bedroom blinds when she saw the two

police cars "roll up" and an officer casually walked up to Movant's vehicle. She testified, "Yeah, I was peeking out the blinds talking to the guy I work with, and I seen [Movant] shoot the officer." She said she was not sure if Movant was in the car or had already gotten out of the car, but she saw Officer Snyder fall to the ground. She did not hear anything because her window was closed. After that, "chaos" ensued in her home with much screaming, but she went to the living room and saw Movant and Officer Becker exchange gunfire.

Movant maintained at trial that he lacked the requisite mental state to commit murder in the first degree, and that his act of shooting Officer Snyder to death constituted murder in the second degree. The defense called several witnesses, including a forensic psychologist (Doctor), to address Movant's mental state at the time of the shooting. Doctor testified she evaluated Movant prior to trial and conducted in-person interviews with Movant in June 2017. Doctor explained that Movant suffered from bipolar disorder, attention-deficit hyperactivity disorder, generalized anxiety disorder, panic disorder, and polysubstance use disorder, which impacted Movant's behavior and thinking when he shot Officer Snyder. Doctor further testified about the "barrage of social media stuffed with all this [sic] antisocial attitudes that he has where he is saying F the police, and I don't care, and I want to take them out," noting that Movant experienced homicidal ideation associated specifically with police officers in connection with his bipolar disorder. Doctor concluded that Movant's conduct was not a deliberate attempt at "suicide by cop" and that:

> At the time of the offense [Movant] was manic, suicidal, paranoid and emotionally unstable. His initial action of shooting Officer Snyder appears to have been instinctive, reflexive [sic] action, and the reaction of being approached from the side under dark environmental conditions, and internal conditions of heightened fear, paranoia and hopelessness.

4

During its deliberations, the jury requested information to clarify its understanding of deliberation by the defendant, asking for a transcript of Mother's trial testimony and a legal definition of "cool reflection." The jury returned guilty verdicts on all counts. The court sentenced Movant to life without parole pursuant to the statutory mandate on the count of first-degree murder, seven years in prison on the count of second-degree assault on a law enforcement officer, and ten years in prison on each of the two counts of armed criminal action, with all counts to run consecutively. This court affirmed the convictions in *Forster*, 616 S.W.3d 436.

Movant filed his *pro se* motion to vacate, set aside or correct the judgment or sentence with the motion court on May 10, 2021. Post-conviction relief counsel (PCR Counsel) was appointed and, after receiving extensions, timely filed Movant's amended motion for post-conviction relief (Amended Motion) on September 22, 2021. In his Amended Motion, Movant raised three claims that Trial Counsel had provided ineffective assistance of counsel. Relevant to this appeal, Movant alleged Trial Counsel was ineffective for failing to impeach Mother with her own conflicting statements about the moments leading up to the shooting and the shooting itself that would have opened the door to favorable evidence that tended to show that Movant did not deliberate prior to the shooting.

*Evidentiary hearing*

The motion court held an evidentiary hearing on May 11, 2023, during which only Trial Counsel testified. Mother had passed away and was unavailable to testify. Trial Counsel confirmed the defense strategy at trial was diminished capacity, and that he relied on Officer Becker's trial testimony describing the shooting. Trial Counsel testified he was in possession of and reviewed the police report that contained Mother's initial statement, the transcript and

5

recording of Mother's initial statement to police, and her deposition transcript. The police report

containing Mother's statement just after the shooting occurred stated the following:

> When asked, [Mother] said [Movant] was still seated in driver's seat of his car
> when the gunshot was fired. [Mother] also said the police officer approached
> [Movant's] car in the normal manner. She said he was immediately shot. As a
> result she did not believe he had the chance to say anything to [Movant] but she
> was unsure as her bedroom window was closed.

> During her October 6, 2016 initial interview with detectives, the following was stated:

> Det. P: Okay. Could you see like the muzzle flash, like the bright light or
> anything like that, okay? So you definitely [ ] one shot and then you saw the
> policeman [go down]?

> [Mother]: I seen the policeman fall.

> During her December 10, 2018 deposition, Mother stated the following:

> I see the officers pull up, I see the first officer get out of his car, walk over, walk
> up to [Movant's] car. Didn't even get up to the back door and [Movant] shot him.

Trial Counsel also testified that he interviewed another witness, C.S., prior to trial and

was aware that Mother told her that she had not seen the actual shooting.

Trial Counsel testified the purpose of the trial was to challenge the State's evidence

related to the shooting of the victim, and it was about Movant's mental state. He said Mother's

statement "really didn't impact what we were trying to accomplish with the diminished capacity

defense." He said Mother "saw what she saw," and "there's not a huge difference" between the

witnesses' testimony. Trial Counsel said he was relying on Officer Becker's statement for

Movant's mental defense. He explained, "what we're saying, he's manic, we're saying he's

manic given what Officer Becker is saying, he is so manic that part of his delusion is – all of this

delusional thinking about cops, that is the mental defense."

6

The motion court denied the Amended Motion on August 10, 2023. The motion court found Trial Counsel employed reasonable trial strategy and Movant did not suffer prejudice based on his decisions. This appeal follows.

**Discussion**

In his sole point on appeal, Movant alleges the motion court erred in denying claim 8(b) of his Rule 29.15 Amended Motion because it relied entirely on speculation to supply Trial Counsel with a *post hoc* justification for his unreasonable failure to present evidence in support of the fundamental issue in dispute at trial and, as a result, Movant was prejudiced.[2]

*Standard of Review*

A motion court's judgment is presumed correct and will be overturned only when either its findings of fact or its conclusions of law are clearly erroneous. *McLaughlin v. State*, 378 S.W.3d 328, 336-37 (Mo. banc 2012); Rule 29.15(k). To overturn a motion court's ruling, the ruling must leave the appellate court with a "definite and firm impression that a mistake has been made." *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009) (internal quotations omitted).

To be entitled to post-conviction relief for ineffective assistance of counsel, a defendant must satisfy the two-prong *Strickland* test. *McLaughlin*, 378 S.W.3d at 337 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). First, the defendant must show his attorney failed to exercise the level of skill and diligence that a reasonably competent attorney would exercise in a similar situation. *Id.*

---

[2] The State argues Movant's point does not follow the proper format set forth in Rule 84.04(d), and that a point such as Movant's that does not properly state the legal reasons for a specific claim of reversible error is not preserved for appellate review. *See City of Harrisonville v. Missouri Dept. of Natural Resources*, 681 S.W.3d 177, 181 (Mo. banc 2023) (quoting *Storey v. State*, 175 S.W.3d 116, 126 (Mo. banc 2005)). We do not condone improper briefing, but because we are able to discern Movant's argument, we prefer to rule on the merits. *See Sunshine & Gov't Accountability Project v. Missouri House of Representatives*, 688 S.W.3d 704, 713 (Mo. App. W.D. 2024).

Second, the trial counsel's failure must prejudice the defendant. *Id.* A defendant must show both prongs by a preponderance of the evidence to prove ineffective assistance of counsel. *Id.* Even if the movant successfully demonstrates his attorney failed to exercise the level of skill and diligence that a reasonably competent attorney would have in a similar situation, he still must show that the deficient performance prejudiced the defense. *Zink*, 278 S.W.3d at 175. Thus, the movant must demonstrate that, absent the claimed error, there is a reasonable probability that the outcome would be different. *Strickland*, 466 U.S. at 694. This exists when there is "'a probability sufficient to undermine confidence in the outcome.'" *Anderson v. State*, 196 S.W.3d 28, 33-34 (Mo. banc 2006) (quoting *Strickland*, 466 U.S. at 694).

<u>*Analysis*</u>

If Movant fails to satisfy either the performance prong or prejudice prong, we do not need to consider the other when reviewing a claim of ineffective assistance of counsel. *Hendricks v. State*, 663 S.W.3d 875, 881 (Mo. App. E.D. 2023) (internal citations omitted). In the interest of judicial economy, we begin with a review of the second prong of the *Strickland* test because we find Movant suffered no prejudice as he did not meet his burden to show the outcome of the trial would be different.

Movant alleges that but for Trial Counsel's failure to present evidence that would show Movant's lack of deliberation before he shot Officer Snyder,[3] the outcome of the jury's deliberations was affected. Movant claims the jury was unable to consider the causal link between Movant's mental disease or defect and allegedly his reactive, reflexive actions in the split second between the victim opening the car's door and the shooting of the victim. He claims

---

[3] To be convicted of first-degree murder, the State must prove that the defendant knowingly caused the death of another person after deliberation on the matter. *State v. Scott*, 676 S.W.3d 336, 343 (Mo. App. E.D. 2023). Deliberation means a cool reflection upon the death of the victim for some amount of time, no matter how short. *Id.*

8

that Mother's prior statements "arguably" contradicted Officer Becker's testimony with respect to deliberation and Movant's opportunity to terminate the attack once it began, and Trial Counsel failed in properly presenting the evidence.

However, a motion court does not clearly err in denying relief based on such conclusory claims. *Woods v. State*, 458 S.W.3d 352, 360 (Mo. App. W.D. 2014) ("Mere conclusory speculations of prejudice by Movant are not considered substantive evidence of counsel's ineffectiveness." (internal quotation omitted)). "When the testimony of a potential witness would only impeach the State's witness, relief on a claim of ineffective assistance of counsel is not warranted." *Proudie v. State*, 644 S.W.3d 41, 56 (Mo. App. E.D. 2022) (internal quotations omitted); *see also State v. Phillips*, 940 S.W.2d 512, 524 (Mo. banc 1997) ("mere failure to impeach a witness . . . does not entitle a movant to postconviction relief."). Movant's proposed evidence would have, at best, impeached Mother's testimony. It would not have produced a viable defense for Movant especially considering the detailed account of the incident from Officer Becker, the overwhelming social media evidence of Movant's deliberation of killing over the past several months, and Trial Counsel's opinion that impeachment evidence of Mother would not have made a difference.[4]

Movant contends the holding in *Black v. State* is analogous to the situation here in that it discusses the significance of the jury's requests. 151 S.W.3d 49 (Mo. banc 2004). In *Black*, the defendant was on trial for first-degree murder arising from a fight after a night out drinking. *Id*. at 51-52. All witnesses agreed that the defendant stabbed and killed the victim, but they did not agree on how the stabbing occurred, and whether the defendant stabbed the victim without

---

[4] Deliberation can be inferred through evidence of a complex plan. *State v. Driscoll*, 55 S.W.3d 350, 356-57 (Mo. banc 2001). Preexisting disputes between a defendant and victim, also known as "bad blood" evidence, also creates an inference that the defendant deliberated. *State v. Gomez*, 672 S.W.3d 113, 120 (Mo. App. S.D. 2023).

9

provocation. *Id.* at 52-53. The defendant claimed he acted in self-defense "after the [victim] tried to hit him with the beer bottle, and that even if not acting in self-defense, the State at most proved second-degree murder in the course of a fight, not a deliberate stabbing." *Id.* at 53. There was no dispute that the defendant knowingly killed the victim, so deliberation was the key issue in dispute between parties. *Id.* at 56. The defendant's counsel was aware that several witnesses made statements to police that corroborated the defendant's account of the stabbing before trial, but when they changed their story at trial and told a different version of events favorable to the State and the existence of deliberation, counsel did not impeach the witnesses with their prior inconsistent statements and the defendant was found guilty of murder in the first degree. *Id.* at 54.

The *Black* court granted the ineffective assistance of counsel claim and held that counsel's failure to present evidence that focused on the "very root of the matter in controversy" and did not relate to "a matter so fully and properly proved by other testimony as to take it out of the areas of serious dispute" constituted ineffective assistance of counsel. *Id*. at 56 (quoting *State v. Kidd*, 990 S.W.2d 175, 180 (Mo. App. W.D. 1999)). The jury could have heard two different accounts of the incident but was left with only the State's account. *Id.* Movant argues that here, like *Black*, the jury asked the trial court for two additional pieces of information during their deliberation: a transcript of Mother's trial testimony and a more extensive definition of deliberation than the approved jury instructions provided.

However, *Black* is the antithesis of Movant's situation here. Not only does *Black* fail to involve a diminished capacity defense as Movant's case does, but the *Black* case was also premised on a self-defense theory that challenged the State's evidence regarding the factual circumstances surrounding the offense that supported an inference of deliberation. Here, instead,

10

Movant used a diminished capacity defense, arguing he had a mental disease or defect that precluded him from having the capacity to deliberate at all, not self-defense. Additionally, the court found the evidence in *Black* was not overwhelming, consisting mostly of the State's witnesses testifying. *Id.* at 58. Here at trial, the jury was provided with the diminished capacity defense evidence, detailed evidence of Officer Becker's eye-witness testimony as well as the vague testimony of Mother, which would have remained vague even if she was impeached with her prior testimony.

The *Black* court also held that the impeachment evidence involving inconsistent statements was substantive evidence describing the factual circumstances of the offense that went to a "central, controversial issue on which the jury focused during deliberations." *Id.* Moreover, "[i]f believed by the jury, there [was] a reasonable probability that the outcome of the trial would have been different." *Id.* Here, however, the impeachment evidence from Mother's alleged inconsistent statement on whether she saw the shooting occur still remains uncertain, as she could not hear anything through her closed window during her distracted phone call, and thus, could not provide substantive evidence. The evidence of Movant committing the act of shooting Officer Snyder and Movant's time to deliberate was clearly and consistently described by Officer Becker. Further, the evidence of Movant's anti-police sentiments and desire to kill on social media was overwhelming, which provided ample evidence for the jury to find either he had diminished capacity or manic state as described by Doctor, or alternatively, his cool reflection had been contemplated for quite a while, if the jury did not believe the diminished capacity defense.[5]

---

[5] In Movant's direct appeal, this court found that because the anti-police sentiments expressed by Movant were cumulative to other evidence properly admitted at trial, including evidence proffered by Movant, Movant could not demonstrate any prejudice from the failure of his Trial Counsel to admit evidence of his jail-house phone call with his father expressing Movant's contempt for police. *Forster*, 616 S.W.3d at 449.

We further find that even if Trial Counsel had presented evidence that Mother made inconsistent statements regarding her observation of the encounter, or impeached Mother with this evidence, it would not have benefited Movant because the jury heard overwhelming evidence of Movant's anti-police sentiments and his desire to kill that demonstrated one of two choices for the jury: Movant was in a manic state with a diminished capacity, or he had been deliberating about killing someone, especially a police officer, over the past several months based on the abundant social media posts he made, which were presented as evidence. Movant's attempt to buy firearms and his actual purchase of a gun also demonstrated evidence that he was making plans to kill someone. The fact that Officer Becker had his window down to hear and testify to Officer Snyder's greeting to Movant and announcement that he stated, "show me your hands" and repeated, "police, show me your hands" before he was shot also provided the necessary testimony for a jury to consider and find Movant deliberated before he shot Officer Snyder. Mother's questionable observations that she was inside the house and unable to hear any greeting, or that it was dark and she was not sure whether Movant was in the car or out of it at the time Movant shot Officer Snyder, was not Movant's most damaging testimony, and impeaching her inconsistent testimony that the shot was immediately fired would not have changed the jury's understanding of the scene.

Movant provided no evidence that the impeachment of Mother would have changed the outcome of trial by eliminating a finding of deliberation such that the jury would have delivered a "not guilty" verdict on the charge of first-degree murder. The motion court's judgment was not clearly erroneous in denying Movant's post-conviction claim for ineffective assistance of Trial Counsel based on Movant's failure to demonstrate prejudice in any mistake Trial Counsel might have made. Movant's point is denied.

12

**Conclusion**

The motion court's judgment is affirmed.

_____
Lisa P. Page, Presiding Judge

Renée Hardin-Tammons, J., and
Rebeca Navarro-McKelvey, J., concur.